777 So.2d 856 (1999)
Joseph Michael WILSON
v.
STATE.
CR-97-2569.
Court of Criminal Appeals of Alabama.
November 19, 1999.
Rehearing Denied January 7, 2000.
*874 Elissa H. Green, Huntsville, for appellant.
Bill Pryor, atty. gen., and Beth Jackson Hughes, asst. atty. gen., for appellee.
BASCHAB, Judge.
The appellant, Joseph Michael Wilson, was convicted of capital murder for the killings of Charles Lamar Hemphill, Michael A. Beaudette, Johnny Couch, and Brian Carter. The murders were made capital because the appellant committed them by one act or pursuant to one scheme or course of conduct. See § 13A-5-40(a)(10), Ala.Code 1975. He was also convicted of attempting to murder Ashley Rutherford and Michelle Hayden. See §§ 13A-6-2 and 13A-4-2, Ala.Code 1975. After a sentencing hearing, the jury recommended, by a vote of 12-0, that the appellant be sentenced to death by electrocution. The trial court accepted the jury's recommendation and sentenced the appellant to death for the capital murder conviction. It also sentenced him to serve 20 years in prison for each of the attempted murder convictions, ordering that he serve those sentences consecutively to his death sentence.
In September 1996, Michelle Hayden and Ashley Rutherford, who were engaged to be married, lived together in a room in the house in which Rutherford's aunt lived. On or about September 18, 1996, the appellant, Nicholas Acklin, and Corey Johnson *875 went to Rutherford's residence and acted like they wanted to buy some marijuana. After looking at the marijuana, the three men left. However, Johnson returned, asked to see the marijuana again, and then grabbed the marijuana and left. Shortly thereafter, Lamar Hemphill, who was visiting Rutherford, realized that his cellular telephone was missing. When he called the telephone's number, the appellant answered. Hemphill then filed a complaint with the sheriff's department, alleging that the appellant stole his cellular telephone. A few days later, the appellant discovered that a complaint had been filed against him.
On September 25, 1996, Hayden, Hemphill, and Brian Carter were watching television in Hayden and Rutherford's room while Rutherford was at work. Michael Skirchak and Johnny Couch, who were on their way to pick up Michael Beaudette, stopped to visit them. Around 10 p.m., the appellant, Acklin, and Johnson arrived, and the appellant started asking who had filed a warrant against him for taking a cellular telephone. Hemphill stated that he did not know anything about a warrant and that only a complaint had been filed. Johnson then started slapping Hemphill, Couch, Carter, and Skirchak around. Using a Jack Daniel's whiskey bottle, he hit Hemphill in the head and Carter in the mouth. He also grabbed Couch by his hair, which was long, and repeatedly slammed his head into a dresser. At one point, Johnson held Couch up by his hair, and the appellant cut Couch's hair. The appellant also repeatedly "stomped" Couch, who was lying on the floor. Sometime later, Beaudette arrived and was told to empty his pockets.
The appellant, Acklin, and Johnson were all armed with pistols. At one point, while Acklin and Johnson remained armed, the appellant laid his gun on a table and dared the others to grab it. He also held his gun to Skirchak's head and asked him about the warrant. During the evening, the appellant made some of the males take off their pants and give him their identification cards. He also made statements like "Y'all don't know who you're f_____ with. Y'all are fake. We're real." (R. 780), and "I ain't even supposed to be here. I'm the leader of this crew. I'm not even supposed to be here. I'm supposed to be at home with my wife or girlfriend." (R. 780-81.) Throughout the evening, the appellant repeatedly said, "This is my crew."
Around 11:20 or 11:30 p.m., Rutherford came home from work. The appellant, Acklin, and Johnson questioned him about the warrant and warned him not to lie to them. They made him take his pants off, and the appellant took two necklaces from him. The appellant yelled at Rutherford, slapped him, and spit in his face. He also made Hayden say "My boyfriend [Rutherford] ain't s____." Additionally, Acklin put a gun in Rutherford's mouth and made him gag.
Throughout the evening, the appellant repeatedly made comments like, "Let's buck them" and "You don't f____ with Joey's crew." Witnesses testified that "buck" meant "shoot" or "kill." One time, Hayden told the appellant to be quiet or he would wake up Rutherford's aunt. In response, the appellant said, "Well, we can take care of her too." (R. 1448.) As the violence escalated, Johnson tried to stop the appellant and Acklin, but they made fun of him. Finally, the appellant told Acklin that if Acklin would shoot the first one, he would shoot the rest of them. Shortly after that comment, Acklin grabbed Rutherford and shot him in the back of the head. The appellant then started shooting. When the shooting started, Skirchak ran out of the house and sought help. After firing 19 times, the appellant, Acklin, and Johnson left, and Rutherford and his aunt telephoned for help.
Medical personnel and law enforcement officers arrived around midnight, and Rutherford immediately identified the appellant as the perpetrator. Around 12:15 a.m., officers apprehended the appellant *876 and Johnson and found a revolver that had been used in the incident in their vehicle. Later, they found a Ruger P89, two Lorcin pistols, another revolver, and Beaudette's driver's license at Acklin's residence.
After they arrested him, the appellant made a statement to Investigator Kevin Turner about his involvement in the offense. In that statement, the appellant admitted that he, Acklin, and Johnson went to Rutherford's residence about a dispute over a cellular telephone. He stated that he had a revolver and that Acklin and Johnson also had weapons. He admitted that they slapped some of the victims and that one thing led to another and the shooting started. When the shooting started, he said he ran to his vehicle, Acklin and Johnson followed him, and they all left. He initially told Turner he did not remember who did the shooting, but then said, "[T]hat's my crew y'all got locked up out there. I'm not going to turn and rat on them." (R. 922.)
At trial, one of the appellant's friends testified that the appellant telephoned him from jail after the offense, talked about the incident, and told him to "finish the job," which he took to mean to kill the surviving witnesses. One of the appellant's cell mates testified that the appellant had bragged about his involvement in the offense. He also testified that the appellant had made statements about having friends "on the outside" who had persuaded Hayden not to testify and who could "take care of" witnesses in the cell mate's case.
Hemphill, Beaudette, Couch, Carter, Hayden, and Rutherford sustained gunshot wounds as a result of the incident. Hemphill, Beaudette, Couch, and Carter died as a result of the gunshot wounds they sustained, and Hayden and Rutherford were injured. Forensic testing revealed that Carter had been shot with a Ruger P89, and Skirchak, Hayden, and Rutherford testified that the appellant had been armed with a Ruger P89. During the penalty phase of the trial, the appellant admitted that he had been armed with a Ruger P89 and that he had shot Carter, but denied that he had shot anyone else.
The appellant raises several issues on appeal that he did not raise at trial. Although the lack of an objection at trial will not bar our review of an issue in a case involving the death penalty, it will weigh against any claim of prejudice the appellant may raise. See Ex parte Kennedy, 472 So.2d 1106 (Ala.), cert. denied, 474 U.S. 975, 106 S.Ct. 340, 88 L.Ed.2d 325 (1985). Rule 45A, Ala. R. App.P., provides:
"In all cases in which the death penalty has been imposed, the Court of Criminal Appeals shall notice any plain error or defect in the proceedings under review... whenever such error has or probably has adversely affected the substantial right of the appellant."
"[This] plain-error exception to the contemporaneous-objection rule is to be `used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result.'" United States v. Young, 470 U.S. 1, 15, 105 S.Ct. 1038, 1046, 84 L.Ed.2d 1 (1985) (quoting United States v. Frady, 456 U.S. 152, 163, 102 S.Ct. 1584, 1592, 71 L.Ed.2d 816 n. 14 (1982)).

I.
The appellant's first argument is that the trial court erred in not instructing the jury on the lesser included offense of felony murder. Although he requested that the trial court instruct the jury on felony murder, he did not object when the trial court refused to do so. In fact, he agreed that an instruction on felony murder would not be appropriate. (R. 1513.)
"No party may assign as error the court's giving or failing to give a written instruction, or the giving of an erroneous, misleading, incomplete, or otherwise improper oral charge, unless the party objects thereto before the jury retires to consider its verdict, stating the matter to which he or she objects and the grounds of the objection."
*877 Rule 21.3, Ala. R.Crim. P. Because the appellant did not present this claim to the trial court, we review it for plain error. See Rule 45A, Ala. R.App. P.
A person commits the crime of felony murder if:
"He commits or attempts to commit arson in the first degree, burglary in the first or second degree, escape in the first degree, kidnapping in the first degree, rape in the first degree, robbery in any degree, sodomy in the first degree or any other felony clearly dangerous to human life and, in the course of and in furtherance of the crime that he is committing or attempting to commit, or in immediate flight therefrom, he, or another participant if there be any, causes the death of any person."
§ 13A-6-2(a)(3), Ala.Code 1975. Thus, the offense of felony murder involves an intended felony and an unintended homicide. See Williams v. State, 601 So.2d 1062 (Ala. Cr.App.1991), aff'd, 662 So.2d 929 (Ala.), cert. denied, 506 U.S. 957, 113 S.Ct. 417, 121 L.Ed.2d 340 (1992). Finally, with regard to instructions on lesser included offenses, § 13A-1-9(b), Ala.Code 1975, provides: "The court shall not charge the jury with respect to an included offense unless there is a rational basis for a verdict convicting the defendant of the included offense." (Emphasis added.)
The appellant argues that, without an instruction on felony murder, "there was no way that the jury could reconcile convicting [him] of one intentional murder, two attempted murders, and still hold him accountable for the remaining three homicides." (Appellant's brief at p. 4.) Under his theory that he shot only one victim, if he were not found to be an accomplice, he would not be responsible for the attempted murders of Rutherford or Hayden. Continuing under that theory, there was no felony upon which to base a felony murder conviction. Therefore, his argument is flawed. Furthermore, although the appellant argues that he intentionally killed only one person, the jury found that he was responsible, as an accomplice, for killing the other three decedents. The evidence in this case was overwhelming and amply supported the jury's conclusion. Accordingly, under the facts of this case, there was no rational basis for a verdict convicting the appellant of felony murder, and the trial court's refusal to give such an instruction did not rise to the level of plain error.

II.
The appellant's second argument is that the prosecution improperly introduced evidence about his prior criminal activities. In Bush v. State, 695 So.2d 70, 85 (Ala.Cr.App.1995), aff'd, 695 So.2d 138 (Ala.), cert. denied, 522 U.S. 969, 118 S.Ct. 418, 139 L.Ed.2d 320 (1997), we discussed the admissibility of evidence about other crimes, explaining as follows:
"Evidence of any offense other than that specifically charged is prima facie inadmissible. Nicks v. State, 521 So.2d 1018 (Ala.Cr.App.1987), aff'd, 521 So.2d 1035 (Ala.), cert. denied, 487 U.S. 1241, 108 S.Ct. 2916, 101 L.Ed.2d 948 (1988). However, evidence of collateral crimes or bad acts is admissible as part of the prosecutor's case if the defendant's collateral misconduct is relevant to show his guilt other than by suggesting that he is more likely to be guilty of the charged offense because of his past misdeeds. Nicks v. State; Brewer v. State, 440 So.2d 1155 (Ala.Cr.App.1983); C. Gamble, McElroy's Alabama Evidence, § 69.01(1) (4th ed.1991). Before its probative value will be held to outweigh its potential prejudicial effect, the evidence of a collateral crime must not only be relevant, it must also be reasonably necessary to the state's case, and it must be plain and conclusive. Averette v. State, 469 So.2d 1371 (Ala.Cr.App.1985). If evidence of the accused's commission of another crime is admissible, the state may prove in meticulous detail the manner in which the accused committed such other crime. Nelson v. State, 511 So.2d 225, 234 (Ala.Cr.App.1986), aff'd, 511 *878 So.2d 248 (Ala.1987), cert. denied, 486 U.S. 1017, 108 S.Ct. 1755, 100 L.Ed.2d 217 (1988); Weatherford v. State, 369 So.2d 863 (Ala.Cr.App.), cert. denied, 369 So.2d 8[7]3 (Ala.), cert. denied, 444 U.S. 867, 100 S.Ct. 141, 62 L.Ed.2d 91 (1979); McElroy's, § 69.02(8). The generally recognized exceptions to the general exclusionary rule, or tests for relevancy, whereby evidence of collateral crimes or acts may be admitted are as follows:
"`(1) Relevancy to prove physical capacity, skill, or means to commit the now-charged crime; (2) part of the res gestae or part of a continuous transaction; (3) relevancy to prove scienter or guilty knowledge; (4) relevancy to prove criminal intent; (5) relevancy to prove plan, design, scheme, or system; (6) relevancy to prove motive; (7) relevancy to prove identity; (8) relevancy to rebut special defenses; and (9) relevancy in various particular crimes.'
"Nelson v. State, 511 So.2d 225, 233 (Ala.Cr.App.1986); Twilley v. State, 472 So.2d 1130 (Ala.Cr.App.1985). All of the exceptions relate to the relevancy of the evidence, which means that evidence of separate and distinct crimes is admissible only when the evidence is relevant to the crime charged. Mason v. State, 259 Ala. 438, 66 So.2d 557 (1953); Nicks v. State. If the evidence is not so remote as to lose its relevancy, the decision to allow or to not allow evidence of collateral crimes or acts as part of the state's case rests in the sound discretion of the trial court. McGhee v. State, 333 So.2d 865 (Ala.Cr.App.1976)."
These concepts have been incorporated into the Alabama Rules of Evidence. Specifically, Rule 404(b), Ala. R. Evid., provides:
"Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial."
Furthermore, we note that the appellant did not object at trial to the admission of the testimony about which he now complains. Accordingly, we review this claim under the plain error rule. See Rule 45A, Ala. R.App. P.
First, the appellant contends that Officer Michael Young improperly "testified that he and his partner kept a photograph and other information on Wilson with him in his patrol car." (Appellant's brief at p. 10-11) (emphasis original). During the prosecutor's direct examination of Officer Young, the following occurred:
"[Young]: Officer Norris has a picture box that he keeps on hand of people that he runs across. When the BOLO [be on the lookout] came out for Mr. Wilson
"[Prosecutor]: It was for Mr. Wilson?
"[Young]: Yes, sir. The name came out Joey Wilson over the radio. When that BOLO came out Officer Norris pulled his file out because he had dealt with Joey previously. He pulled the file out. He keeps the name and address on each individual that he runs across. He gave us the address he last had on Del Norte Drive."
(R. 868-69.) The appellant contends that Young's testimony was improper because it allegedly informed the jury that "the patrol officers had had so many encounters with Mr. Wilson that they kept a photograph of him in their mini-dossier of local criminals maintained in the patrol car" and that it allegedly "informed the jury that Mr. Wilson had been in extensive previous trouble with law enforcement." (Appellant's *879 brief at p. 11.) Contrary to the appellant's assertions, Young did not refer to him as a criminal and did not state or imply that he had had extensive previous trouble with law enforcement. He did not testify that the appellant had previously been investigated for, arrested for, or charged with any criminal offense or activity. Further, he did not testify that the box contained information about local criminals. Rather, Young testified that Norris kept information about "each individual that he runs across," and stated that Norris had "dealt with Joey previously." Norris could have used the box to store information about witnesses or informants with whom he had come in contact, and he could have "dealt with" the appellant in that context. Therefore, Young's comments that Norris had run across and dealt with the appellant did not improperly refer to any prior criminal activity on the part of the appellant. Furthermore, Young testified that he and Norris located and arrested the appellant within approximately 15 minutes after receiving the BOLO. Thus, his testimony about the box established how they were able to identify and locate the appellant so quickly after the murders. Accordingly, we do not find any plain error in Young's testimony.
Second, the appellant contends that the State repeatedly and improperly introduced irrelevant evidence about his alleged drug-dealing activities. Specifically, he complains that the prosecutor improperly asked one of its witnesses, Khristian Ashby, who he had obtained drugs from and that the witness improperly testified that he had obtained drugs from, and sold drugs for, the appellant. During his cross-examination of Ashby, defense counsel elicited testimony that Ashby had been arrested for several drug-related offenses, that Ashby had made a deal with one of the narcotics investigators to help him "set up" the appellant in exchange for favorable treatment on one of his pending cases, and that Ashby had previously sold drugs. On redirect examination, the prosecutor then elicited testimony that Ashby had sold drugs for the appellant.
Later, during direct examination, Ashley Rutherford testified that the appellant, Acklin, and Johnson had come to his residence approximately one week before the offenses and had acted like they wanted to buy some marijuana. He further testified that Johnson grabbed the marijuana and left. During his cross-examination of Rutherford, defense counsel elicited testimony that the appellant had previously sold marijuana to Rutherford.
Finally, one of the appellant's cell mates testified as to statements the appellant made about the murders. He testified that the appellant bragged about the quantity of drugs he was selling, even from his jail cell. In that regard, he also testified that the appellant had said that, on the night of the murders, when he had tried to collect some money that was owed to him, the people did not have the money. The appellant told the cell mate that he decided he was going to get paid or going to start killing the people who owed him. Finally, the appellant told about shooting and killing the decedents.
When read in context of the entire trial, much of the testimony about the appellant's drug-related activities was relevant to show one possible motive the appellant had for committing the murders. Furthermore, defense counsel also elicited some of the testimony about the appellant's drug-related activities and used it in presenting a defense. Accordingly, testimony about such activities that may have been improperly admitted was harmless because it was merely cumulative to evidence about such activities that was properly admitted. See Rule 45, Ala. R.App. P.; White v. State, 650 So.2d 538 (Ala.Cr. App.1994), overruled on other grounds, Ex parte Rivers, 669 So.2d 239 (Ala.Cr.App. 1995).
Finally, the appellant contends that the State improperly elicited testimony that one of the first officers to respond *880 to the crime scene was a narcotics investigator and that that investigator knew him. Again, he contends that this was evidence of bad character that told the jury he was a well-known drug dealer who had had prior contacts with law enforcement officers. (Appellant's brief at p. 13.) During direct examination, Investigator Michael Salomonsky testified that he was a narcotics investigator and that he was one of the first officers to arrive at the crime scene. On cross-examination by defense counsel, Salomonsky testified that he and another officer, who was in another vehicle, were working together on another case in the area on the night of the offense. When he heard the call on the radio for the other officer to respond, he also responded because the department was shorthanded at the time. Later, Ashley Rutherford testified that, when he identified the appellant as the perpetrator to Salomonsky, Salomonsky knew the appellant. Again, however, there was not any indication that Salomonsky knew the appellant because of any involvement in criminal activity. Salomonsky did not make any statement about the appellant being a drug dealer or a person with whom law enforcement officers had had previous contacts. Although he indicated that he knew who the appellant was, that knowledge could have come from experiences completely unrelated to his employment as a law enforcement officer. Consequently, we do not find that there was any plain error in this regard.
For the above-stated reasons, we conclude that the prosecution did not improperly introduce evidence about the appellant's prior criminal activity.

III.
The appellant's third argument is that the reliability of the jury's death recommendation was destroyed when improper evidence was admitted in support of the aggravating circumstance that the offense was especially heinous, atrocious, or cruel when compared to other capital offenses. See § 13A-5-49(8), Ala.Code 1975. Initially, he contends that the State improperly elicited ultimate-issue testimony from law enforcement officers that, in their opinion and based on their observations, the offense was heinous, atrocious, or cruel. In particular, he argues that the officers incorrectly concluded that the offense was heinous, atrocious, or cruel because the killings appeared to have been carried out in an execution-style fashion. Because the Alabama Supreme Court has held that execution-style killings are not, by definition, especially heinous, atrocious, or cruel, he also contends that an improper analysis was used in determining that the aggravating circumstance existed.
We agree with the appellant's argument that an execution-style killing is not necessarily especially heinous, atrocious, or cruel when compared to other capital offenses. See Ex parte Clark, 728 So.2d 1126 (Ala.1998). In Clark, the Alabama Supreme Court stressed that the especially heinous, atrocious, or cruel aggravating circumstance must be narrowly interpreted and applied only to those cases in which the killing is unnecessarily torturous to the victim.
"In Lindsey v. Thigpen, 875 F.2d 1509 (11th Cir.1989), the United States Court of Appeals for the Eleventh Circuit upheld this Court's application of the `especially heinous, atrocious or cruel' aggravating circumstance because this Court's application of it provided a `principled way to distinguish' cases in which the death penalty is appropriately imposed from cases in which it is not. Id. at 1513, 1515 (upholding our application of Ala.Code 1975, § 13A-5-49(8) and quoting Godfrey, 446 U.S. at 431, 100 S.Ct. 1759, 64 L.Ed.2d 398). The Eleventh Circuit emphasized that the Alabama appellate courts' interpretation of § 13A-5-49(8) passed muster under the Eighth Amendment because this Court and the Court of Criminal Appeals had consistently defined `especially heinous, atrocious or cruel' to include only `those conscienceless or pitiless homicides *881 which are unnecessarily torturous to the victim.' Lindsey v. Thigpen, at 1514 (quoting Ex parte Kyzer, 399 So.2d 330, 334 (Ala.1981)) (emphasis added).
". . . .
"... [A]n expansion of the aggravating circumstance set out in § 13A-5-49(8) to encompass a murder not involving torture, merely because the State labels the murder an `execution-style' slaying would abandon the very interpretation that the Eleventh Circuit held critical to the constitutional application of that aggravating circumstance."
Clark, 728 So.2d at 1139-40 (footnote omitted). In accordance with these principles, the especially heinous, atrocious, or cruel aggravating circumstance has been narrowly defined.
"In Ex parte Kyzer, 399 So.2d 330, 334 (Ala.1981), this Court held that the standard applicable to the `especially heinous, atrocious, or cruel' aggravating circumstance under § 13A-5-49(8) is that for a crime to fit within that section it must be one of `those conscienceless or pitiless homicides which are unnecessarily torturous to the victim.'
". . . .
"This Court has decided upon an approach for the purposes of § 13A-5-49(8). In comparing capital offenses for the purposes of determining whether a capital offense was `especially heinous, atrocious or cruel,' the court uses the Kyzer standard. Capital offenses falling under § 13A-5-49(8) are, pursuant to the Kyzer standard, those `conscienceless or pitiless homicides which are unnecessarily torturous to the victim.' Kyzer, 399 So.2d at 334."
Ex parte Bankhead, 585 So.2d 112, 124-25 (Ala.1991). The torture element of the circumstance may involve both physical and psychological torture. See Price v. State, 725 So.2d 1003, 1035 (Ala.Cr.App. 1997), aff'd, 725 So.2d 1063 (Ala.1998), cert. denied, 526 U.S. 1133, 119 S.Ct. 1809, 143 L.Ed.2d 1012 (1999). Also, psychological torture can involve the victim's being forced to watch family members die prior to his own death, see Ex parte Ford, 515 So.2d 48, 52 (Ala.1987), cert. denied, 484 U.S. 1079, 108 S.Ct. 1061, 98 L.Ed.2d 1023 (1988); Godbolt v. State, 546 So.2d 982 (Ala.Cr.App.1986), remanded on other ground, 546 So.2d 991 (Ala.1987); Woodall v. State, 730 So.2d 627 (Ala.Cr.App.1997), aff'd in relevant part, rev'd on other grounds, 730 So.2d 652 (Ala.1998); and Price, supra, or the victim's being in intense fear of, and powerless to prevent, his own impending death, see Norris v. State, [Ms. CR-94-0871, March 26, 1999] ___ So.2d ___ (Ala.Cr.App. 1999).
However, we do not agree with the appellant's argument that the testimony of the law enforcement officers constituted improper testimony about the ultimate issue before the jury. As we stated in Smith v. State, 756 So.2d 892 (Ala.Cr. App.1997), aff'd, 756 So.2d 957 (Ala. 1999):
"In determining whether a capital offense is especially heinous, atrocious, or cruel, the factfinder can compare the murder at issue with other capital crimes. The testimony of an experienced police officer who had investigated many capital crimes could be invaluable in making such a determination."
Furthermore,
"[a]ny evidence which has probative value and is relevant to sentence shall be received at the sentence hearing regardless of its admissibility under the exclusionary rules of evidence, provided that the defendant is accorded a fair opportunity to rebut any hearsay statements."
§ 13A-5-45(d), Ala.Code 1975. Therefore, the ultimate issue rule did not apply during the sentencing proceedings, and the testimony was not improper on that basis. See Rule 1101(b)(3), Ala. R. Evid. Furthermore, although the officers incorrectly concluded that the execution-style nature of the killings established that they were heinous, atrocious, or cruel, their testimony was still relevant and probative. During direct examination, the prosecutor defined *882 the terms "heinous," "atrocious," and "cruel" separately. He then asked the officers whether, in their opinion based on their law enforcement experience and their observations, these killings were heinous, atrocious, or cruel. Later, he asked additional questions about the execution-style nature of the killings. Therefore, the execution-style nature of the killings, combined with the testimony of the survivors about the torture the decedents suffered before their deaths, was relevant in determining whether the especially heinous, atrocious, or cruel aggravating circumstance applied. Therefore, the testimony of the officers was not improper.
Finally, error, if any, in the admission of the testimony of the officers was harmless. See Rule 45, Ala. R.App. P. In its oral charge, the trial court instructed the jury on the correct standard to apply in determining whether the aggravating circumstance existed, stating as follows:
"The second aggravating circumstance, as I understand it, that the State alleges in this case is that this capital offense was especially heinous, atrocious or cruel. We can understand that murder is in and of itself sometimes heinous and sometimes atrocious and sometimes cruel. It's sometimes all of those things. But in order to be an aggravating circumstance for the purpose of invoking the death penalty our law says that it must be especially so when compared to other capital offenses. The term `heinous' has been defined to mean extremely wicked or shockingly evil. The term `atrocious' has been defined to mean outrageously wicked and violent. The term `cruel' has been defined to mean designed to inflict a high degree of pain with utter indifference to or even enjoyment of the suffering of others. It has at times been defined as unnecessary torture."
(R. 1838-39.) The trial court also instructed the jury that it would ultimately decide whether the aggravating circumstance existed. As set forth throughout this opinion, there was overwhelming evidence from which the jury could conclude that the offense was especially heinous, atrocious, or cruel compared to other capital offenses. Finally, in its sentencing order, the trial court made the following findings about the applicability of this aggravating circumstance:
"The capital offense was especially heinous, atrocious or cruel compared to other capital offenses. As noted above, some 19 rounds were fired. Prior to the discharge of the weapons, the victims were subjected to threats and intimidation. Some were struck. At least two were struck with a bottle and one was stomped by the defendant. The victims were restrained at gunpoint and required to remove portions of their clothing. They were taunted and abused for a lengthy period of time. By any standard acceptable to civilized society, this crime was extremely wicked and shockingly evil. The defendant was unnecessarily torturous in his commission of the crimes. While the Court recognizes that all capital offenses are heinous, atrocious and cruel to some extent, the degree of heinousness, atrociousness and cruelty which characterizes this offense exceeds that which is common to all capital offenses."
(C.R.263-64.) There is no indication that the jury or the trial court applied an incorrect standard in finding that this aggravating circumstance existed. The evidence more than adequately supports a finding that the offense was especially heinous, atrocious, or cruel when compared to other capital offenses. Therefore, viewed in the context of the entire trial, error, if any, in the admission of the testimony of the officers was harmless. See Rule 45, Ala. R.App. P.

IV.
The appellant's fourth argument is that the prosecution and the trial court improperly minimized the jury's role in sentencing, thereby violating Caldwell v. *883 Mississippi, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985). First, he contends that the prosecutor improperly told the jurors that, if they returned a death sentence, they would not be taking the appellant's life and that the imposition of the death penalty would be the result of the State applying the laws of the state. He further alleges that the trial court compounded the prejudicial effect of the prosecutor's statement when it repeatedly instructed the jury that its verdict was a recommendation and that the court would ultimately determine the appropriate sentence. Finally, he contends that the verdict form underscored the fact that the jury's verdict was not important because it informed the jury in two places that its verdict was a recommendation. However, he did not object to these alleged violations at trial. Therefore, we review this claim for plain error. See Rule 45A, Ala. R.App. P.
During his penalty-phase closing arguments, defense counsel stated, "Punishment is going to be had by virtue of your verdict.... I am asking you not to hate someone or have such feelings toward someone that you will go past that which has to be the ultimate punishment, never seeing the outside of the free world again." (R. 1818-19.) Shortly thereafter, he also argued as follows:
"If Joey Wilson were in the water drowning, holding his hand up to you, would you push his hand down? If you can do that, then you know what your vote is. If you could push the hand of any human being back down in the water, reaching up to you for help, then go ahead. Recommend what you have got to recommend to this court. If your answer is differently on that question, then please make the recommendation that would be appropriate in this case, that of life without parole."
(R. 1820-21.) In his rebuttal argument, the prosecutor argued as follows:
"Don't let anyone say to you you are taking his life, as he took the life of someone else. Ladies and gentlemen, you are not going to take his life, whatever you may say, whatever all 12 of you might say.... The Judge is not going to take his life. If it is taken, it will be taken by the State applying the laws of this State."
(R. 1832-33.) The Alabama Supreme Court addressed a similar comment in Ex parte Taylor, 666 So.2d 73, 88 (Ala.1995), cert. denied, 516 U.S. 1120, 116 S.Ct. 928, 133 L.Ed.2d 856 (1996), and held as follows:
"Finally, we must review the final comments the prosecutor made to the jury during the penalty phase of the trial, in which he told the jurors they were `not going to kill anybody.' Taylor claims that the prosecutor's comment misled the jurors regarding the importance of their responsibility in rendering an advisory verdict. This statement by the prosecutor was the only one to which Taylor's objection by motion in limine, made before closing arguments, would apply. We conclude, however, that the prosecutor's comment was a fair response to defense counsel's statement made immediately before, by which defense counsel argued to the jury that a recommendation of death would kill both Michael Taylor and his mother. `[A] prosecutor has the right to "reply in kind" to statements made by defense counsel in the defense's closing argument.' Ex parte Musgrove, 638 So.2d 1360, 1369 (Ala.1993), cert. denied, Rogers v. Alabama, [513] U.S. [845], 115 S.Ct. 136, 130 L.Ed.2d 78 (1994). The prosecutor's remark was not reversible error."
Similarly, we conclude that the prosecutor's comment in this case was a reply in kind to comments defense counsel made during his closing argument, rather than an attempt to diminish the importance of the jury's role in sentencing. Therefore, we do not find any plain error with regard to this comment.
*884 As to the appellant's remaining claims, we have carefully reviewed the entire record for Caldwell violations, and we have not found any.
"Under Caldwell v. Mississippi, 472 U.S. 320, 105 S.Ct. 2633, 2639, 86 L.Ed.2d 231 (1985), `it is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere.' However, the comments of the prosecutor and the instructions of the trial court accurately informing a jury of the extent of its sentencing authority and that its sentence verdict was `advisory' and a `recommendation' and that the trial court would make the final decision as to sentence does not violate Caldwell. `[C]omments which accurately explain the respective functions of the Judge and jury are permissible under Caldwell "as long as the significance of [the jury's] recommendation is adequately stressed."` Harich v. Wainwright, 813 F.2d 1082, 1101 (11th Cir. 1987). Here, neither the prosecutor nor the trial court misrepresented the effect of the jury's sentencing recommendation. The cases of Caldwell, supra; Mann v. Dugger, 817 F.2d 1471 (11th Cir.), vacated, 828 F.2d 1498 (1987); Adams v. Wainwright, 804 F.2d 1526 (11th Cir.1986), modified, Adams v. Dugger, 816 F.2d 1493 (11th Cir.1987); and Harich, supra, each involved a situation where the prosecutor and the trial court misled the jury as to its critical role in sentencing under state law. In Hooks v. State, 534 So.2d 329 (Ala.Cr. App.1987), this Court reviewed the decisions of other jurisdictions which have confronted this issue and concluded: `The trial judge's and the prosecutor's remarks clearly defined the jury's role in the sentencing scheme. Thus, the jury could not have been confused as to its responsibility in the sentencing process. The remarks made here were a correct statement of the law and did not tend to mislead or misinform the jury. Therefore, we conclude the remarks were not improper under Caldwell, supra.'"
Martin v. State, 548 So.2d 488, 494 (Ala. Cr.App.1988), aff'd, 548 So.2d 496 (Ala.), cert. denied, 493 U.S. 970, 110 S.Ct. 419, 107 L.Ed.2d 383 (1989). In this case, neither the prosecution nor the trial court referred to the jury's sentencing verdict as "merely a recommendation." Although both stated that the jury's verdict would be a "recommendation," that is a correct statement of Alabama law. See § 13A-5-47, Ala.Code 1975. Furthermore, neither attempted in any way to minimize the jury's role and responsibility in sentencing. Rather, throughout the trial, both the prosecution and the trial court emphasized the importance of the jury's role and responsibility in sentencing, and both accurately informed the jury about the extent of its sentencing authority. Accordingly, we do not find any plain error in this regard.

V.
The appellant's fifth argument is that several errors in the trial court's jury instructions deprived him of a fair trial and an accurate sentence determination.
"A trial court has broad discretion in formulating its jury instructions, provided those instructions accurately reflect the law and the facts of the case. Raper v. State, 584 So.2d 544 (Ala.Cr.App. 1991). A trial court's oral charge to the jury must be construed as a whole, and must be given a reasonablenot a strainedconstruction. King v. State, 595 So.2d 539 (Ala.Cr.App.1991); Kennedy v. State, 472 So.2d 1092 (Ala.Cr. App.1984)."
Williams v. State, 710 So.2d 1276, 1305 (Ala.Cr.App.1996), aff'd, 710 So.2d 1350 (Ala.1997), cert. denied, 524 U.S. 929, 118 S.Ct. 2325, 141 L.Ed.2d 699 (1998).

*885 "`A trial court has broad discretion in formulating its jury instructions, providing they are an accurate reflection of the law and facts of the case. Coon v. State, 494 So.2d 184 (Ala.Cr. App.1986). When requested charges are either fairly and substantially covered by the trial judge's oral charge or are confusing, misleading, ungrammatical, not predicated on a consideration of the evidence, argumentative, abstract, or a misstatement of the law, the trial judge may properly refuse to give such charges. Ex parte Wilhite, 485 So.2d 787 (Ala.1986).'
"Ward v. State, 610 So.2d 1190, 1194 (Ala.Cr.App.1992)."
Hemphill v. State, 669 So.2d 1020, 1021 (Ala.Cr.App.1995) (emphasis omitted). See also Dill v. State, 600 So.2d 343, 353-54 (Ala.Cr.App.1991), aff'd, 600 So.2d 372 (Ala.1992), cert. denied, 507 U.S. 924, 113 S.Ct. 1293, 122 L.Ed.2d 684 (1993).

A.
First, the appellant contends that the trial court did not instruct the jury that it had to unanimously find that he committed the capital offense. He argues that, to find him guilty of the capital offense charged, the jury had to find that he intentionally killed two of the decedents. He further argues that, because Acklin and Johnson were also present and charged with committing the murders, the question of whether he was responsible for the deaths of two or more of the decedents was critical. Therefore, he contends that the trial court should have instructed the jurors that they had to unanimously find that he intentionally killed the same two decedents to support a capital conviction. Because the appellant did not present this argument to the trial court, we review it for plain error. See Rule 45A, Ala. R.App. P.
The trial court's instruction on the capital offense was almost identical to the pattern jury instruction on the capital murder of two or more people pursuant to a single scheme or course of conduct. "A trial court's following of an accepted pattern jury instruction weighs heavily against any finding of plain error." Price v. State, 725 So.2d 1003, 1058 (Ala.Cr.App. 1997), aff'd, 725 So.2d 1063 (Ala.1998), cert. denied, 526 U.S. 1133, 119 S.Ct. 1809, 143 L.Ed.2d 1012 (1999). Also, the trial court thoroughly instructed the jury on principles of complicity or accomplice liability. Finally, from the verdict forms, it is clear that the jurors unanimously agreed that the appellant was responsible for the murders of all four of the decedents. Accordingly, we do not find any plain error in this instance.

B.
Second, the appellant contends that the trial court did not properly instruct the jury that he had to have the specific intent to kill at least two of the decedents to be found guilty of the capital offense. He also contends that the trial court did not instruct the jury on the particularized intent necessary to support a capital murder conviction. The record refutes these arguments. During its oral charge, the trial court specifically instructed the jury on intent with regard to each decedent and explained that that intent must be a particularized intent to kill. When read in conjunction with the trial court's instructions on complicity or accomplice liability, the trial court sufficiently instructed the jury on intent. Therefore, the appellant's argument is without merit.

C.
Third, the appellant contends that the trial court incorrectly instructed the jury on intentional murder because it stated that intentional murder "is the death of one individual." (R. 1637.) He contends that the statement prevented the jury from finding that he intentionally killed more than one of the decedents but that the killings did not occur as part of one scheme or course of conduct. He also *886 argues that the trial court erred because it did not define the phrase "single scheme or course of conduct" for the jury. Because the appellant did not present these claims to the trial court, we review them for plain error. See Rule 45A, Ala. R.App. P.
In instructing the jury on intentional murder, the trial court substantially followed the pattern jury instruction on intentional murder. As stated above, the trial court also substantially followed the pattern jury instruction for the capital murder of two or more people pursuant to a single scheme or course of conduct. These facts weigh heavily against a finding of plain error. See Price, supra. Moreover, the phrase "single scheme or course of conduct" was not so technical that the jurors could not use their common sense to interpret and understand it. As we stated in Roberts v. State, 735 So.2d 1244, 1252 (Ala.Cr.App.1997):
"The word `intent' is not a term of art or legal jargon. It is a commonly used and understood word with a clear meaning. Moreover, as the United States Supreme Court has recognized:
"`Jurors do not sit in solitary isolation booths parsing instructions for subtle shades of meaning in the same way that lawyers might. Differences among them in interpretation of instructions may be thrashed out in the deliberative process, with common sense understanding of the instructions in the light of all that has taken place at the trial likely to prevail over technical hairsplitting.'
"Boyde v. California, 494 U.S. 370, 380-81, 110 S.Ct. 1190, 1198, 108 L.Ed.2d 316 (1990).
"In this case, the jurors' common sense understanding was sufficient; the court was not required to define the term. No plain error occurred. See Williams v. State, 710 So.2d 1276 (Ala. Cr.App.1996)."
Finally, as stated in Part I of this opinion, under the facts of this case, there was simply no rational basis for a finding that the appellant intentionally murdered more than one of the decedents, but that he was not guilty of the capital offense. Therefore, the appellant's arguments are without merit.

D.
Fourth, the appellant contends that the trial court improperly lowered the State's burden of proof by instructing the jury that the State "simply" had to prove him guilty beyond a reasonable doubt. He also contends that the trial court's reasonable doubt instruction violated Cage v. Louisiana, 498 U.S. 39, 111 S.Ct. 328, 112 L.Ed.2d 339 (1990). Because the appellant did not present these claims to the trial court, we review them under the plain error rule. See Rule 45A, Ala. R.App. P.
We have reviewed the trial court's instruction on reasonable doubt, and we conclude that it did not violate Cage. The instruction did not suggest that the jury could find the appellant guilty based on a burden of proof lower than that required by constitutional due process protections, and it did not mislead or confuse the jury. Also, the trial court did not improperly lower the State's burden of proof by its use of the word "simply." In its instruction, it explained: "Now, the State is not required to convince you of the defendant's guilt beyond all doubt or to a mathematical certainty, nor beyond a shadow of a doubt, but simply beyond all reasonable doubt." (R. 1624-25.) Finally, throughout the proceedings, the trial court repeatedly stressed that the State carried the heavy burden of proving the appellant guilty beyond a reasonable doubt. Therefore, we do not find that there was any plain error in the trial court's reasonable doubt instruction. See Ex parte Taylor, 666 So.2d 73 (Ala.1995), cert. denied, 516 U.S. 1120, 116 S.Ct. 928, 133 L.Ed.2d 856 (1996); Coral v. State, 628 So.2d 954 (Ala.Cr.App. 1992), aff'd, 628 So.2d 1004 (Ala.1993), cert. *887 denied, 511 U.S. 1012, 114 S.Ct. 1387, 128 L.Ed.2d 61 (1994).

E.
Fifth, the appellant contends that the trial court erred in its penalty phase instructions by presuming that a death sentence would be imposed and by restricting the mitigating circumstances the jury could consider. He did not present these arguments to the trial court. Accordingly, we review them for plain error. See Rule 45A, Ala. R.App. P.
Initially, the appellant contends that, by stating that procedures must be followed to avoid arbitrary imposition of the death penalty, the trial court effectively told the jury that a sentence of death was a foregone conclusion and that the court and the jury simply needed to follow those procedures to arrive at a verdict of death. However, reading the trial court's penalty-phase instructions as a whole, we conclude that this argument is without merit. Immediately after the challenged statement, the trial court instructed on the concepts of aggravation and mitigation, defined the applicable statutory aggravating and mitigating circumstances, defined nonstatutory mitigating circumstances, and explained the process of weighing aggravating and mitigating circumstances. There is absolutely nothing in the trial court's instructions that stated or implied that a death sentence was presumed or a foregone conclusion. The trial court made it clear throughout the proceedings that, during the penalty phase, the jury could recommend a sentence of imprisonment for life without the possibility of parole or a sentence of death. Furthermore, the trial court made it clear that the jury could recommend a death sentence only under limited circumstances. Accordingly, we do not find any plain error in this regard.
The appellant also contends that the trial court restricted which mitigating circumstances the jury could consider. First, he argues that the trial court improperly stated that § 13A-5-52, Ala.Code 1975, sets forth "some additional mitigating circumstances" the jury could consider. Second, he contends that the trial court denigrated the concept of mitigation by stating that "[p]ractically anything ... could be a mitigating circumstance." (R. 1843.) Because the appellant did not present these arguments to the trial court, we review them for plain error. See Rule 45A, Ala. R.App. P.
The record refutes the appellant's claims. In its charge, the trial court thoroughly instructed the jury on the concept of mitigation and its importance in a capital trial. When read in context, the above-referenced comments did not limit which mitigating circumstances the jury could consider and did not denigrate the concept of mitigation. Therefore, we do not find any plain error in this regard.
For the above-stated reasons, the appellant's contention that the trial court's jury instructions deprived him of a fair trial and an accurate sentence determination is without merit.

VI.
The appellant's sixth argument is that there was a critical and material variance between the indictment and the State's proof at trial that denied him a fair trial and an accurate penalty determination. Specifically, he contends that, by stating that he caused the deaths of "Charles L. Hemphill, Michael A. Beaudette, Johnny Couch, and Brian Carter," the State was required to prove that he killed all four of the decedents. Based on that contention, he further argues that the trial court erred in instructing the jury that, to convict him of the capital offense, it had to find only that he killed two or more of the decedents.
Initially, we note that the indictment substantially tracks the language of the capital murder statute. See § 13A-5-40(a)(10), Ala.Code 1975. Also, the trial court substantially followed the pattern *888 jury instruction when charging the jury on the capital offense of murder of two or more people pursuant to one scheme or course of conduct. Further, "the State is not required to notify the defendant in the indictment or otherwise that it is proceeding under a complicity theory." Johnson v. State, 612 So.2d 1288, 1297 (Ala.Cr.App. 1992) (citations omitted). Finally, as set forth in Part XXIV of this opinion, the jury concluded that the appellant was responsible, under accomplice liability principles, for the murders of all four victims, and the evidence supported that conclusion. Therefore, we conclude that the appellant had sufficient notice of the charges against him and that there was not a material variance between the indictment and the proof at trial.

VII.
The appellant's seventh argument is that this court must remand this case for the trial court to determine whether the prosecution unconstitutionally used its peremptory challenges to remove women from the venire. On appeal, he specifically contends that the prosecution's use of 12 of its 16 peremptory challenges to remove women from the venire establishes a prima facie showing of gender-based discrimination. Because he did not raise an objection on this ground at trial, we review this contention under the plain error rule. See Rule 45A, Ala. R.App. P.
"`For plain error to exist in the Batson context, the record must raise an inference that the state [or the defendant] engaged in "purposeful discrimination" in the exercise of its peremptory challenges. See Ex parte Watkins, 509 So.2d 1074 (Ala.), cert. denied, 484 U.S. 918, 108 S.Ct. 269, 98 L.Ed.2d 226 (1987).'
"Guthrie v. State, 616 So.2d 913, 913 (Ala.Crim.App.1992) ...."
Rieber v. State, 663 So.2d 985, 991 (Ala.Cr. App.1994), aff'd, 663 So.2d 999 (Ala.), cert. denied, 516 U.S. 995, 116 S.Ct. 531, 133 L.Ed.2d 437 (1995).
"This court is bound by the certified record on appeal. The certified record provides no foundation for considering this issue....
"In many cases the appellate courts in this state have refused to find plain error grounded on Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), when no prima facie showing of discrimination appears on the face of the record. Ex parte Watkins, 509 So.2d 1074 (Ala.1987), cert. denied, 484 U.S. 918, 108 S.Ct. 269, 98 L.Ed.2d 226 (1987); Jenkins v. State, 627 So.2d 1034 (Ala.Cr.App.1992), aff'd, 627 So.2d 1054 (Ala.1993); Kuenzel v. State, 577 So.2d 474, 489 (Ala.Cr.App.1990), aff'd, 577 So.2d 531 (Ala.), cert. denied, 502 U.S. 886, 112 S.Ct. 242, 116 L.Ed.2d 197 (1991)."
Dobyne v. State, 672 So.2d 1319, 1327 (Ala. Cr.App.1994), aff'd, 672 So.2d 1354 (Ala. 1995), cert. denied, 517 U.S. 1169, 116 S.Ct. 1571, 134 L.Ed.2d 670 (1996). Finally,
"Alabama courts have recently held that even a showing that [a] party had struck a high percentage of strikes used against a minority was not alone enough. In Ex parte Trawick, 698 So.2d 162, 168 (Ala.1997), the Alabama Supreme Court held, `Without more, we do not find that the number of strikes this prosecutor used to remove women from the venire is sufficient to establish a prima facie case of gender discrimination.'
". . . .
"According to the record, the appellant in this case relied solely upon the fact that seven of the eight veniremembers struck by the prosecutor were black. According to the Alabama Supreme Court in Ex parte Trawick as well as the United States Supreme Court's interpretation of the burden in equal protection cases, these bare statistics were not sufficient to make a prima facie showing of discrimination."
*889 Armstrong v. State, 710 So.2d 531, 533-35 (Ala.Cr.App.1997).
After thoroughly reviewing the record on appeal, we conclude that it does not raise any inference that the prosecution engaged in purposeful discrimination against women in its use of its peremptory challenges. Furthermore, the appellant's arguments in his brief do not raise such an inference. Accordingly, we do not find any plain error in this regard.

VIII.
The appellant's eighth argument is that the prosecutor repeatedly commented on his post-Miranda silence, in violation of Doyle v. Ohio, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976). Because he did not present this contention to the trial court, we review it for plain error. See Rule 45A, Ala. R.App. P.
The appellant complains that the State commented on his silence during opening arguments when the prosecutor stated:
"When the defendant was apprehended, they took him to the police station and read him his rights. Finally he was interviewed. He was interviewed, but he didn't say anything. He talked to Investigator Kevin Turner, who used to be with the Sheriff's Department and now he is with our office, the District Attorney's Office. So when he talked to Kevin Turner, he told Kevin, `No, I had a .357 that night.' And when Kevin said to him, `Who did the shooting,' he said, `Oh, K.T., I can't rat on my crew. My crew got locked up. I can't rat on them.' So that was pretty much the extent of his statement."
(R. 631.) He also complains that the State violated Doyle during the following exchanges:
"[Prosecutor]: Lt. Franklin, I have a couple more questions. You remember that you read the rights warning to Joey Wilson?
"[Lt. Franklin]: That is correct.
"[Prosecutor]: Did he respond to anything after you read him his rights? Did he agree to talk to you?
"[Lt. Franklin]: Yes, he agreed to talk with me.
"[Prosecutor]: So after you gave him his rights did he talk with you?
"[Lt. Franklin]: No, sir, he didn't talk with me. When I asked him the question wanting to know the whereabouts of the person by the name of Nick he would not respond to that question. Instead, he made some complaints about his asthma and about his arm hurting. That's the only other question I asked him. I left and went back to Arcadia Circle to the Criminal Investigation Division.
"[Prosecutor]: So all he ever talked to you about was his ailments; is that right?
"[Lt. Franklin]: That's all he would talk to me about."
(R. 912.)
"[Prosecutor]: Did he indicate to you that he understood [his Miranda] rights?
"[Officer Edger]: Yes, sir, he did.
"[Prosecutor]: Did you question him any further?
"[Officer Edger]: I basically asked him to tell me what had went on that night, to which he replied he didn't know what I was talking about.
"[Prosecutor]: Is that all?
"[Officer Edger]: Yes, sir, that's about the extent of it."
(R. 916.) The appellant later made a statement to Investigator Kevin Turner in which he admitted his involvement in the crime.
In Doyle, the United States Supreme Court held that "the use for impeachment purposes of petitioners' silence, at the time of arrest and after receiving Miranda warnings, violated the Due Process Clause of the Fourteenth Amendment." 426 U.S. at 619, 96 S.Ct. at 2245. From our review of the record, we conclude *890 that the prosecutor did not violate Doyle. There is no indication in the record that the appellant ever invoked his right to remain silent during questioning by law enforcement officers. See Hardy v. State, [Ms. CR-95-0589, March 26, 1999] ___ So.2d ___ (Ala.Cr.App.1999). Rather, the testimony indicates that he waived his right to remain silent and agreed to talk to the officers. The comments and testimony about which the appellant complains are not improper references to his post-Miranda silence. Rather, they are references to his waiver of his right to remain silent and the statements he made after that waiver. Even though he was reluctant to answer the questions some of the officers asked, he did not at any time clearly invoke his right to remain silent. Furthermore, error, if any, was harmless because the evidence against the appellant was overwhelming and because he actually made a statement to one officer in which he admitted his presence at the crime scene and his involvement in the offense. See Rule 45, Ala. R.App. P.
The appellant also claims that the prosecutor improperly drew the jury's attention to the fact that he would not testify at trial. Specifically, he argues that the prosecutor improperly characterized comments he made to a cell mate as "what he testified to about a year ago in jail." (Appellant's brief at p. 49) (emphasis added). However, this was clearly simply a misstatement by the prosecutor. There is no indication that a reasonable juror would have interpreted the statement to be a comment on the appellant's decision not to testify at trial. Therefore, the appellant's argument is without merit.

IX.
The appellant's ninth argument is that the trial court did not consistently find and consider mitigating circumstances. However, he did not first present this claim to the trial court. Therefore, we review it for plain error. See Rule 45A, Ala. R.App. P.
The following portion of the trial court's sentencing order is pertinent to a consideration of the appellant's claims:
"The defense asserted the presence of mitigating circumstances. Although the defense did not rely on all the statutory mitigating circumstances, the court reviews all of the statutory mitigating circumstances in this sentencing order.
"(1) The defendant has no significant history of prior criminal activity. See Alabama Code, Sec. 13A-5-51(1) (1994 Repl.Vol.). The court finds that this mitigating circumstance is applicable.
"(2) The capital offense was committed while the defendant was under the influence of extreme mental or emotional disturbance. See Alabama Code, Sec. 13A-5-51(2) (1994 Repl.Vol.). The court finds that this mitigating circumstance is inapplicable. No evidence has been presented to this court that the defendant was under any extreme mental or emotional disturbance at the time of the capital offense.
"(3) The victim (or victims) was (were) a participant (participants) in the defendant's conduct or consented to it. See Alabama Code, Sec. 13A-5-51(3) (1994 Repl.Vol.). The court finds that this mitigating circumstance is inapplicable. The statutory mitigating circumstance that the victim was a participant in the criminal act or consented to that act was neither asserted nor proved. It simply is not an issue in this case. The court rejects this mitigating circumstance. It is completely inapplicable.
"(4) The defendant was an accomplice in a capital offense committed by another person and his participation was relatively minor. See Alabama Code, Sec. 13A-5-51(4) (1994 Repl.Vol.). The court finds that this mitigating circumstance is inapplicable. No evidence exists to lead this court to believe the defendant was a minor actor in this capital murder. Quite the contrary, the evidence establishes *891 that this defendant was a principal actor in this capital murder and admitted to shooting one of the victims during the sentencing phase of trial. The absence of credible evidence to the contrary requires the court to reject this mitigating circumstance.
"(5) The defendant acted under extreme duress or under the substantial domination of another person. See Alabama Code, Sec. 13A-5-51(5) (1994 Repl.Vol.). The court finds that this mitigating circumstance is inapplicable. Three persons were accused of committing these murders. The evidence leads this court to the well-guarded conclusion that the defendant was the principal actor. Significant evidence points to the defendant's role as a willing and active participant, if not the leader, in this capital murder. Clearly there is no evidence that the defendant was under extreme duress or the substantial domination of another person. The evidence requires the court to reject the statutory mitigating circumstance.
"(6) The capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was substantially impaired. See Alabama Code, Sec. 13A-5-51(6) (1994 Repl.Vol.). The court finds that this mitigating circumstance is inapplicable. There is no evidence that Wilson suffers from a great subnormality of the mind. Anti-social behavior does not establish this statutory mitigating circumstance. The court has persuasive evidence before it that the defendant was able to clearly explain his version of the entire events surrounding the alleged crime. The evidence taken as a whole requires the court to reject the statutory mitigating circumstance. The evidence falls woefully short of the statutory mitigating circumstance that the defendant's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired.
"(7) The age of the defendant at the time of the crime. See Alabama Code, Sec. 13A-5-51(7) (1994 Repl.Vol.). The court finds that this mitigating circumstance is applicable. The defendant was 19 years of age at the time of the capital murder.
"In summary, two of the statutory mitigating circumstances are applicable in this case.
"The court must also consider any aspect of the defendant's character or record, any circumstances of the offense, or any other relevant mitigating circumstance which the defendant might proffer as a basis for a sentence of life imprisonment without parole rather than death. See Alabama Code, Section 13A-5-52 (1994 Repl.Vol.); Clisby v. State, 456 So.2d 99 (Ala.Cr.App. 19[8]3), cert. denied, 470 U.S. 100[9, 105 S.Ct. 1372] (1985).
"The defendant does not have a significant prior history of assaultive or violent conduct. Although that fact does not establish the statutory mitigating circumstance previously discussed, the court has considered that fact in reaching its decision. The court has also considered that two witnesses from the defendant's church testified that he was a person of good character and participated in church activities.
"In fact, the court carefully has search[ed] all of the evidence in the case, whether presented by the State or the defense, for evidence of mitigation, whether or not raised by the defense, in view of the fact that this is a capital case.
"WEIGHING THE CIRCUMSTANCES

"The evidence proves beyond a reasonable doubt the existence of two statutory aggravating circumstances. Two statutory mitigating circumstances are present. No other statutory mitigating circumstances were proved by at least a *892 preponderance of the evidence. The Court did weigh several nonstatutory mitigating circumstances, but found them to be weak and unpersuasive."
(C.R.264-67.)
The appellant first contends that the sentencing order is "irrational and inconsistent." Specifically, he claims that the trial court's statement that the fact that he did not have a significant prior history of assaultive or violent conduct "does not establish the statutory mitigating circumstance previously discussed" disavowed its previous finding that he did not have a significant history of prior criminal activity. (C.R.267.) When read in context, it appears that, in addition to finding the statutory mitigating circumstance, the trial court also found as a nonstatutory mitigating circumstance that the appellant did not have a significant prior history of assaultive or violent conduct. In fact, the court indicated that it considered both of these circumstances in reaching its decision. Therefore, the appellant's argument is without merit.
The appellant also contends that the trial court erred by not considering the fact that his accomplices had not been convicted of capital murder and sentenced to death. However, at the time the trial court sentenced the appellant, his accomplices had not been convicted or sentenced. Therefore, the trial court could not compare the appellant's sentence to the sentences imposed in cases involving his accomplices. Furthermore, as discussed in Part XXVI of this opinion, the appellant's sentence is not disproportionate or excessive when compared to the sentences imposed in similar cases. Accordingly, his argument is without merit.
The appellant's final complaint is that the trial court did not specifically find and consider nonstatutory mitigating circumstances because it did not enumerate them in its sentencing order.
"A sentencer in a capital case may not refuse to consider or be `precluded from considering' mitigating factors. Eddings v. Oklahoma, 455 U.S. 104, 110, 102 S.Ct. 869, 874, 71 L.Ed.2d 1 (1982) (quoting Lockett v. Ohio, 438 U.S. 586, 604, 98 S.Ct. 2954, 2964-65, 57 L.Ed.2d 973 (1978)). The defendant in a capital case generally must be allowed to introduce any relevant mitigating evidence regarding the defendant's character or record and any of the circumstances of the offense, and consideration of that evidence is a constitutionally indispensable part of the process of inflicting the penalty of death. California v. Brown, 479 U.S. 538, 107 S.Ct. 837, 93 L.Ed.2d 934 (1987); Ex parte Henderson, 616 So.2d 348 (Ala.1992); Haney v. State, 603 So.2d 368 (Ala.Cr.App.1991), aff'd, 603 So.2d 412 (Ala.1992), cert. denied, 507 U.S. 925, 113 S.Ct. 1297, 122 L.Ed.2d 687 (1993). Although the trial court is required to consider all mitigating circumstances, the decision of whether a particular mitigating circumstance is proven and the weight to be given it rests with the sentencer. Carroll v. State, 599 So.2d 1253 (Ala.Cr.App.1992), aff'd, 627 So.2d 874 (Ala.1993), cert. denied, 510 U.S. 1171, 114 S.Ct. 1207, 127 L.Ed.2d 554 (1994). See also Ex parte Harrell, 470 So.2d 1309 (Ala.), cert. denied, 474 U.S. 935, 106 S.Ct. 269, 88 L.Ed.2d 276 (1985). Moreover, the trial court is not required to specify in its sentencing order each item of proposed nonstatutory mitigating evidence offered that it considered and found not to be mitigating. Morrison v. State, 500 So.2d 36 (Ala.Cr.App.1985), aff'd, 500 So.2d 57 (Ala.1986), cert. denied, 481 U.S. 1007, 107 S.Ct. 1634, 95 L.Ed.2d 207 (1987)."
Williams v. State, 710 So.2d 1276, 1347 (Ala.Cr.App.1996), aff'd, 710 So.2d 1350 (Ala.1997), cert. denied, 524 U.S. 929, 118 S.Ct. 2325, 141 L.Ed.2d 699 (1998) (emphasis added).
The sentencing order clearly refutes the appellant's claim. In its order, the trial court specifically stated that it considered *893 all of the nonstatutory mitigating evidence the appellant presented. In fact, it found that two nonstatutory mitigating circumstances existed: 1) that the appellant did not have a significant prior history of assaultive or violent conduct and 2) that two witnesses from the appellant's church testified that he was a person of good character and he participated in church activities. "`While Lockett and its progeny require consideration of all evidence submitted as mitigation, whether the evidence is actually found to be mitigating is in the discretion of the sentencing authority.' Bankhead v. State, 585 So.2d 97, 108 (Ala.Cr. App.1989)." Ex parte Slaton, 680 So.2d 909, 924 (Ala.1996), cert. denied, 519 U.S. 1079, 117 S.Ct. 742, 136 L.Ed.2d 680 (1997). Although the trial court must consider all mitigating circumstances, it has discretion in determining whether a particular mitigating circumstance is proven and the weight it will give that circumstance. See Williams, supra. The trial court complied with Lockett v. Ohio, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), and its progeny in evaluating the statutory and nonstatutory mitigating evidence offered by the appellant.
For the above-stated reasons, the appellant's argument that the trial court did not consider mitigating circumstances is without merit.

X.
The appellant's tenth argument is that numerous instances of alleged prosecutorial misconduct deprived him of a fair trial and an accurate sentence. Throughout the trial, the trial court repeatedly instructed the jury that statements made by the attorneys were not evidence, that the jury was required to base its decision upon the evidence presented during the proceedings, and that the jury was not to base its decision on passion, prejudice, or any other arbitrary factor. We presume that the jury followed the trial court's instructions. See Taylor v. State, 666 So.2d 36 (Ala.Cr.App.1994), aff'd, 666 So.2d 73 (Ala.1995), cert. denied, 516 U.S. 1120, 116 S.Ct. 928, 133 L.Ed.2d 856 (1996). Also, we evaluate the comments made by the prosecutor in the context of the entire proceeding, not in isolation. See Duren v. State, 590 So.2d 360 (Ala.Cr.App.1990), aff'd, 590 So.2d 369 (Ala.1991), cert. denied, 503 U.S. 974, 112 S.Ct. 1594, 118 L.Ed.2d 310 (1992). In judging a prosecutor's closing argument, the standard is whether the argument "`so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" Darden v. Wainwright, 477 U.S. 168, 181, 106 S.Ct. 2464, 2471, 91 L.Ed.2d 144 (1986) (quoting Donnelly v. DeChristoforo, 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974)).
"In reviewing allegedly improper prosecutorial comments, conduct, and questioning of witnesses, the task of this Court is to consider their impact in the context of the particular trial, and not to view the allegedly improper acts in the abstract. Whitlow v. State, 509 So.2d 252, 256 (Ala.Cr.App.1987); Wysinger v. State, 448 So.2d 435, 438 (Ala.Cr.App. 1983); Carpenter v. State, 404 So.2d 89, 97 (Ala.Cr.App.1980), cert. denied, 404 So.2d 100 (Ala.1981). Moreover, this Court has also held that statements of counsel in argument to the jury must be viewed as delivered in the heat of debate; such statements are usually valued by the jury at their true worth and are not expected to become factors in the formation of the verdict. Orr v. State, 462 So.2d 1013, 1016 (Ala.Cr.App. 1984); Sanders v. State, 426 So.2d 497, 509 (Ala.Cr.App.1982)."
Bankhead v. State, 585 So.2d 97, 106-07 (Ala.Cr.App.1989), aff'd in relevant part, 585 So.2d 112, 127 (Ala.1991), rev'd on other grounds, 625 So.2d 1146 (Ala.1993). Finally,
"`[d]uring closing argument, the prosecutor, as well as defense counsel, has a right to present his impressions from the evidence, if reasonable, and may argue every legitimate inference.' Rutledge *894 v. State, 523 So.2d 1087, 1100 (Ala. Cr.App.1987), rev'd on other grounds, 523 So.2d 1118 (Ala.1988) (citation omitted). Wide discretion is allowed the trial court in regulating the arguments of counsel. Racine v. State, 290 Ala. 225, 275 So.2d 655 (1973). `In evaluating allegedly prejudicial remarks by the prosecutor in closing argument, ... each case must be judged on its own merits,' Hooks v. State, 534 So.2d 329, 354 (Ala. Cr.App.1987), aff'd, 534 So.2d 371 (Ala. 1988), cert. denied, 488 U.S. 1050, 109 S.Ct. 883, 102 L.Ed.2d 1005 (1989) (citations omitted) (quoting Barnett v. State, 52 Ala.App. 260, 264, 291 So.2d 353, 357 (1974)), and the remarks must be evaluated in the context of the whole trial, Duren v. State, 590 So.2d 360 (Ala.Cr. App.1990), aff'd, 590 So.2d 369 (Ala. 1991). `In order to constitute reversible error, improper argument must be pertinent to the issues at trial or its natural tendency must be to influence the finding of the jury.' Mitchell v. State, 480 So.2d 1254, 1257-58 (Ala.Cr.App.1985) (citations omitted). `To justify reversal because of an attorney's argument to the jury, this court must conclude that substantial prejudice has resulted.' Twilley v. State, 472 So.2d 1130, 1139 (Ala.Cr. App.1985) (citations omitted)."
Coral v. State, 628 So.2d 954, 985 (Ala.Cr. App.1992), aff'd, 628 So.2d 1004 (Ala.1993), cert. denied, 511 U.S. 1012, 114 S.Ct. 1387, 128 L.Ed.2d 61 (1994).

A.
First, the appellant contends that the prosecutor impugned the defense for not presenting evidence. During the State's closing argument, the following occurred:
"[Prosecutor]: If Nick Acklin was responsible for all this, if Nick Acklin was the leader, do you think he would keep all the murder weapons? Do you think he would take those back with him to Mt. Lebanon Road and put them in his closet? No. Do you think the .357, if Joey Wilson really had the .357, for example, why was it under Corey's seat in the car? How would that come about? It wouldn't come about. And just generally you remember that you never once heard from anyone's testimony anything about Nick's crew, Corey's crew
"[Defense counsel]: Your Honor, I am going to object. May I approach the bench?
"The Court: Yes.
"(The following occurred at the bench:)
"[Defense counsel]: Your Honor, at this point counsel is coming very close to inferring to the jury that we failed to put on evidence. I object at this time and move for a mistrial.
"The Court: Your motion for a mistrial is overruled. Go ahead.
"[Prosecutor]: You recall the evidence ofI think it was Mikey Skirchak. I said, `Did you ever hear anyone in there say anything about Nick's crew or Corey's crew?' He said, `No.' That's another factor of common sense. Take all those factors into consideration."
(R. 1555-56.)
"`This court, in recognizing the government's burden and obligation of proving guilt beyond a reasonable doubt, has recognized that a prosecutor's comment may be so prejudicial as to shift the burden of proof. See Duncan v. Stynch[c]ombe, 704 F.2d 1213, 1216 (11th cir.1983). Such prosecutorial misconduct, if "so pronounced and persistent that it permeates the entire atmosphere of the trial," requires reversal. United States v. Alanis, 611 F.2d 123, 126 (5th Cir.), cert. denied, 445 U.S. 955, 100 S.Ct. 1607, 63 L.Ed.2d 791 (1980) (quoting United States v. Blevins, 555 F.2d 1236 (5th Cir. 1977), cert. denied, 434 U.S. 1016, 98 S.Ct. 733, 54 L.Ed.2d 761 (1978)). Prosecutors must observe the distinction between the permissible practice of arguing evidence *895 and suggesting inferences which the jury might draw from it and the impermissible practice of arguing suggestions beyond the evidence. See Houston v. Estelle, 569 F.2d 372, 380 (5th Cir.1978). Additionally, prosecutors must refrain from making burden-shifting arguments which suggest that the defendant has an obligation to produce any evidence or to prove innocence. See [In re] Winship, 397 U.S. [358,] at 364, 90 S.Ct. [1068,] at 1072[, 25 L.Ed.2d 368 (1970)]. We reaffirm the former Fifth Circuit's position that "the limits of proper argument find their source in notions of fairness, the same source from which follows the right to due process of law." Houston, 569 F.2d at 380.'
"United States v. Simon, 964 F.2d 1082, 1086 (11th Cir.1992)."
DeBruce v. State, 651 So.2d 599, 604 (Ala. Cr.App.1993), aff'd, 651 So.2d 624 (Ala. 1994).
During the trial, Skirchak, Rutherford, and Hayden all testified that the appellant referred to Johnson and Acklin as his "crew." Additionally, Skirchak testified that he never heard Acklin or Johnson say that the group was their "crew." Finally, both Rutherford and Hayden testified that the appellant was in control on the night of the offense. When viewed in context of the entire trial, the prosecutor's statements did not impermissibly shift the burden of proof to the defense or impugn the defense for not presenting evidence. Rather, the prosecutor's statements were direct comments upon the evidence presented by the witnesses at trial and the inferences therefrom. See Coral, supra. Finally, the trial court instructed the veniremembers to disregard the prosecutor's comments, and we presume that the jury followed the trial court's instructions. See Taylor, supra. Accordingly, we do not find any reversible error in this regard.

B.
Second, the appellant contends that the prosecutor improperly injected his own views on his guilt and on other critical issues. The initial comment the appellant complains about occurred during voir dire examination when the following occurred:
"[Prosecutor]: Now, in a criminal case under our system a person has a right to a jury trial, a jury of his peers. That doesn't happen in all countries. Some countries don't have the time to participate in the justice system. It is a duty and it is a privilege to be a part of this justice system. A lot of people criticize it on one side or the other, but it's your system. You are the one who determines the facts. You are the one who makes up your mind. He has a right to a trial by a jury, and when he has a trial by a jury, every defendant in this country comes in with what we call a presumption of innocence. You at this point must presume that Joey Wilson is guiltyis not guilty. I misspoke, Your Honor. I may assume that he is guilty, but you must presume that he is not guilty. I will ask you this
"[Defense counsel]: Your Honor, I would object to counsel's statement that he may assume he is guilty. I don't think that is a proper thing to be saying, especially in the voir dire portion of this case.
"The Court: Limit your questioning to the voir dire.
"[Prosecutor]: You must presume that he is innocent. If I did we wouldn't be here, would we? But I will leave that.
"[Defense counsel]: Your Honor, I object to counsel's continued statements in the manner he is doing it, especially in this part of this case.
"The Court: Counsel, contain your questions to voir dire questions and not comments about personal observations. That's totally immaterial. Disregard those comments, ladies and gentlemen, completely.

*896 "[Prosecutor]: Is there any person here who will not follow the instructions that the Judge will give you on the presumption of innocence?
"(No response.)"
(R. 288-89) (emphasis added). The appellant argues that the comment amounted to a statement that the prosecutor knew he was guilty of the crimes charged. Initially, we note that the prosecutor did not say that he knew the appellant was guilty or that he presumed him to be guilty. Rather, the prosecutor said that he "may assume" that the appellant was guilty and explained that this was why charges were brought against him. When read in context, it appears that the prosecutor was merely explaining the difference between his role as a prosecutor and the veniremembers' potential roles as jurors. Furthermore, the prosecutor explained the presumption of innocence to the veniremembers and attempted to determine whether they would be able to apply that presumption at trial. The prosecutor emphasized that the appellant must be presumed innocent and asked the venire, "[I]f you were to vote right now, is there any person who would not vote not guilty?" (R. 290.) Accordingly, there was no error in this regard.
The second instance the appellant complains about occurred when the prosecutor was asking the veniremembers if they were against the death penalty. During voir dire examination, the prosecutor stated:
"This case will be in three phases, hopefully. There will be a trial phase where a determination of guilt or not guilty is made. If he is found guilty, then we will move to the second phase where there will be a sentencing phase to the jury, and if he is convicted of capital murder, we will have another mini trial to present it to the jury as to whether or not he should be given life without parole or put to death. I will tell you, ladies and gentlemen, that the State expects to seek the death penalty in this case. Is there anyone who would automatically, if he were convicted, before any evidence is heard in the sentencing phaseis there anyone who would automatically vote for life without parole without considering the alternative?"
(R. 480) (emphasis added). According to the appellant, these statements assumed that a guilty verdict would be returned. Because he did not raise this argument at trial, we will review it for plain error. See Rule 45A, Ala. R.App. P. The prosecutor's comments merely amount to an explanation of the trial process in a capital case. When explaining that process to the venire, the prosecutor explained that if the appellant was convicted of capital murder, then another hearing would be held and the jurors would be asked to vote either for death or for life imprisonment without the possibility of parole. In addition, the prosecutor informed the venire of the State's intent to seek the death penalty in an effort to determine whether any of the veniremembers would be unable to vote for the death penalty. Accordingly, we do not find any plain error in this regard.
The final instance the appellant complains about occurred when the prosecutor asked if any of the veniremembers did not wish to serve on the jury. According to the appellant, "[t]he prosecutor... inject[ed] his own views of the case to assess whether veniremember's responses were `right' or `wrong,' and ... inform[ed] a potential juror that he was answering the voir dire questions in the correct or incorrect fashion." (Appellant's brief at p. 62.) The appellant did not raise this issue at trial. Therefore, we will review the issue for plain error. See Rule 45A, Ala. R.App. P.
When the prosecutor asked the veniremembers who did not wish to serve on the jury to identify themselves, the following occurred:
"[Veniremember D.H.]: [D.H.]
"[Prosecutor]: Ma'am?

*897 "[Veniremember R.T.]: [R.T.]
"[Veniremember]: I don't want to be on it.
"[Prosecutor]: Well, I think all three of you have told us you can't give a fair trial. Yes, sir.
"[Veniremember F.C.]: [F.C.]
"[Prosecutor]: But you have answered all the questions right."
(R. 483.) It appears that the prosecutor was merely informing the responding veniremembers that they were correct to answer the questions truthfully, even if they had said they could not give the appellant a fair trial or they did not want to serve on the jury. Thus, the appellant's argument that the prosecutor's comment amounted to injecting his personal beliefs into the trial is without merit, and there is no plain error in this regard.
For the foregoing reasons, we reject the appellant's argument that the prosecutor improperly injected his own personal beliefs and opinions at trial.

C.
Third, the appellant contends that the prosecutor improperly argued that it was the jury's duty to convict him.
During the State's guilt-phase rebuttal arguments, the prosecutor stated,
"The State in this case, as in every case, proudly shoulders the burden of proof beyond a reasonable doubt. Every time we walk through that door we take up that burden. We expect to. We support that principle. It should be beyond a reasonable doubt. Every time someone is found guilty it is beyond a reasonable doubt. It is not an impossible burden. It may sometimes be difficult to say the words, to follow your duty, your sworn duty, but duty sometimes, ladies and gentlemen, is a cruel master. You have got to follow your conscience. You have got to make this decision. Remember this: Whatever defense counsel says to you, we must prove to you that he killed, caused, procured, or aided or abetted in the death of two or more people, not that he pulled the trigger on every one of them."
(R. 1595-96) (emphasis added). Because the appellant did not object to the prosecutor's statement, we will review this issue for plain error. See Rule 45A, Ala. R.App. P. Contrary to the appellant's assertion, the prosecutor did not state that the jury had a duty to convict the appellant. Rather, he properly stated that it was the jury's duty to make a decision in the case. Therefore, the prosecutor's statement did not rise to the level of plain error.
The second instance occurred during the State's penalty-phase rebuttal arguments, when the prosecutor stated,
"Does Joey Wilson rate your forgiveness? That's not what you are here for. Your are here to render justice. I submit to you that the verdict brought back from your deliberations should be that Joey Wilson should pay the ultimate price and die in the electric chair.
"Now, there has been a lot of talk here about death. We all know something about death, or we all think we know something about death, but to those who have stared eyeball to eyeball with it, they have a different understanding of death. I ask that you do your duty and that you will return to this honorable court a recommendation that Joey Wilson be put to death."
(R. 1833) (emphasis added). Contrary to the appellant's argument, the prosecutor did not equate the jury doing its duty with the jury returning a verdict of death. Rather, the prosecutor asked the jury to do its duty and also asked the jury to return a recommendation for death. Furthermore, as we discussed in Part IV of this opinion, the prosecutor's statements were a reply in kind to defense counsel's plea for mercy in his closing arguments. When viewed in the context of all of the penalty-phase closing arguments, we do not believe that the prosecutor's comment "`so infected the trial with unfairness as to *898 make the resulting conviction a denial of due process.'" Darden v. Wainwright, 477 U.S. 168, 181, 106 S.Ct. 2464, 2471, 91 L.Ed.2d 144 (1986) (quoting Donnelly v. DeChristoforo, 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974)). Therefore, the appellant's argument is without merit.

D.
Fourth, the appellant contends that the prosecutor improperly denigrated the lesser included offenses. He did not object at trial to the prosecutor's comments regarding the lesser included offenses. Accordingly, we will review this claim for plain error. See Rule 45A, Ala. R.App. P. During the State's closing arguments, the prosecutor stated,
"Counsel tells you that Joey Wilson didn't do anything, but now there is that concession. Well, maybe he did. Ladies and gentlemen, he has talked to you about a lesser included offense of just plain old murder of one person. I submit to you that if you are not going to find him guilty of capital murder, let him go. He killed more than two people. Hold him accountable for that. And if you just think he shot Michelle a little bit, if you think that a pistol put to the back of your head and jammed up against your pony tail and shot into your skull is a minor injury and not attempted murder, don't find him guilty of assault, let him go. Hold him accountable for what he did, ladies and gentlemen, and that's murdering people and an attempt to murder people. Counsel said it was pretty clear. I agree with him."
(R. 1610-11). The prosecutor went on to state,
"It is for you who have the duty of arriving at a decision. I know that you take seriously your sworn duty. And I am not putting on a show when I say to you, if you can't find him guilty of what he did, turn, him loose. He killed these people as sure as he put the gun to everybody's head and pulled the trigger. You have heard the evidence. The case is yours."
(R. 1614) (emphasis added). The appellant argues that these statements "presented the jury with the dilemma of either convicting [him] of capital murder or completely acquitting him." (Appellant's brief at p. 65.) When viewed in context, the prosecutor did nothing more than present his reasonable impressions from the evidence and argue legitimate inferences therefrom. See Boyd v. State, 715 So.2d 825 (Ala.Cr.App.1997), aff'd, 715 So.2d 852 (Ala.), cert. denied, 525 U.S. 968, 119 S.Ct. 416, 142 L.Ed.2d 338 (1998). Furthermore, the trial court instructed the jurors as follows: "In this case you are the sole judges of the facts. The weight and the sufficiency of the evidence is for you and you alone. All questions of fact are to be determined by you." (R. 1616-17.) The trial court also instructed the jury on the offense of capital murder and the lesser included offenses of intentional murder and reckless murder as to Hemphill, Beaudette, Couch, and Carter; attempted murder and the lesser included offenses of first-and second-degree assault as to Rutherford; and attempted murder and the lesser included offense of first-degree assault as to Hayden. Therefore, the appellant's argument that the prosecutor's comments left the jury with the dilemma of finding him guilty of capital murder or acquitting him is without merit.

E.
Fifth, the appellant contends that the prosecutor improperly impugned him for protecting his right to a fair trial. Specifically, he argues that the prosecutor's comment that he had received two continuances impugned trial counsel and implied that he was "trying to obfuscate the truth or otherwise delay justice in this case." (Appellant's brief at p. 65-66.) The following occurred during the State's guilt-phase rebuttal arguments:
"[Prosecutor]: Now, they tell you that we wanted to try [the appellant] first. I *899 will admit to that. We wanted to try him first. He tells you there were two continuances granted in this case. Did he tell you what the reason was? You will notice that he didn't say that the State gained two continuances in this case.
"[Defense counsel]: Your Honor, if he wants to tell what the reasons are I don't mind.
"[Prosecutor]: I don't need to tell them, Your Honor.
"[Defense counsel]: Then don't bring it up.
"[Prosecutor]: Who got the continuances? You don't know that. I didn't. Yes, we wanted to try him first because he is the one that caused it. He is the one who led it, and it's his show."
(R. 1598.) Because the appellant did not object to the prosecutor's statements at trial, we review them for plain error. See Rule 45A, Ala. R.App. P.
During defense counsel's opening arguments, the following occurred:
"Now, this case has been, as you have already learned, and as you probably knew from news accounts, anything else, has been in the process for almost two years. Now, this case has been continued several times, a couple of times.
"For some reason, the State wants to try this man first. There are three people in this case, three people charged. They have always wanted to try this man first.
"You heard Mr. Broussard get up here and tell you about how things happened out there on University Drive, and that this man did it. That was the way he presented it to you. Now, I'll bet you he comes back in November when they try Nick Acklin, when he is on trial, and he will be up here stating to you this is what happened out there, and this man did it. Nick Acklin will be sitting over there at that time."
(R. 639-40.) During his closing arguments, defense counsel went on to state:
"Now, they have bent over backwards to try Joey Wilson first in this series right here, and I think you can probably deduce why they have done that. But let me assure you that come October or November, or whenever Nick Acklin's trial is set, what are they going to be doing? They will not be pointing at Joey Wilson and saying he is the one, they are going to be pointing at Nick Acklin and saying he's the one. They can have their cake and eat it too. Have you ever wondered what that meant? I think that fits in this scenario right here of how these cases are being tried."
(R. 1580-81.) After reviewing the statements in the context of the entire trial, it is apparent that the prosecutor was not implying that either defense counsel or the appellant had improper motives for requesting the continuances. Rather, he was responding to defense counsel's statements that the State had "bent over backwards" to try the appellant first, that the prosecutors can "have their cake and eat it too," and the insinuation that the State was attempting to manipulate the justice system. Because the State's comments merely rebutted defense counsel's statements in opening and closing arguments, we do not find any plain error in this regard.

F.
Sixth, the appellant contends that the prosecutor repeatedly argued facts that were not in evidence.
Initially, the appellant argues that the prosecutor's statement that he would "take care" of Acklin "amounted to nothing more than a promise from the district attorney that he would prosecute Acklin [and that] such a promise is based on nothing more than the personal assurance of the prosecutor." (Appellant's brief at p. 68.) Because the appellant did not object to the prosecutor's statement at trial, we will review it for plain error. See Rule 45A, Ala. R.App. P. During his guilt-phase rebuttal arguments, the prosecutor stated: "We *900 will take care of Joey Wilson. Then we will take care of Nick Acklin when the time comes. But today let's concern ourselves with Joey Wilson. They will tell you that Nick Acklin was the leader. I am going to let you decide from the testimony who the leader was." (R. 1599-1600.) Defense counsel had previously alluded to the fact that the State would subsequently try Acklin for the murders. (R. 639-40; 1580-81.) Furthermore, defense counsel had repeatedly emphasized Acklin's responsibility for the crimes and attempted to diminish the appellant's responsibility. The prosecutor's statement was merely a reply in kind to defense counsel's arguments and an attempt to return the focus of the trial to the appellant's responsibility for the crimes. Thus, we do not find any plain error in this regard.
Next, the appellant contends that the prosecutor relied on "phantasmagorical" evidence, nonexistent evidence, or evidence that was not introduced at trial when he argued that a "jailhouse snitch's" testimony was corroborated. (Appellant's brief at p. 68.) During the prosecutor's closing arguments, the following occurred:
"[Prosecutor]: Then you get down to what [the appellant] told Brian O'Neill Harris. `I shot one and then me and Nick blasted on one.' Take State's exhibit whatever it is with the little stick `ems on it, go look at that and tell me if that doesn't jibe exactly with that statement. He killed Brian Carter, and probably as he was scurrying out of there let go a few shots towards the bed. We don't know whether he hit another person.

"[Defense counsel]: Your Honor, I would object to that line of questioning. There has been absolutely no evidence to bolster any portion of the argument being made presently by counsel.
"The Court: Ladies and gentlemen, you are the sole triers of the facts. You heard the evidence. Use your recall on what the evidence was.
"[Prosecutor]: When you look at the State's exhibit that shows particular slugs you will see, first off, that a slug from the Ruger killed Brian Carter. They removed it down there at the autopsy. You will also see on the west wall, back there in the area of the bed, behind the bed, they removed a slug. I think it's number 44. I may not be right. I think it is, though. And that slug too came from the Ruger. Now, the statement he gives to Harris, that matches perfectly. One could conclude that after he shot Brian Carter on his way out he fires one, at least one. I don't know."
(R. 1549-50.) Furthermore, Skirchak, Hayden, and Rutherford all testified that the appellant had a Ruger during the offenses. As we noted previously, "`[d]uring closing argument, the prosecutor, as well as defense counsel, has a right to present his impressions from the evidence, if reasonable, and may argue every legitimate inference.' Rutledge v. State, 523 So.2d 1087, 1100 (Ala.Cr.App.1987), rev'd on other grounds, 523 So.2d 1118 (Ala.1988) (citation omitted)." Coral, 628 So.2d at 985. After reviewing the prosecutor's comments in the context of the entire trial, we conclude that he was merely arguing his impressions from the evidence and the legitimate inferences therefrom. Therefore, the appellant's argument is without merit. Furthermore, the trial court instructed the jury that it was the sole trier of fact and that the jurors should rely on their own recollections of what the evidence showed. We presume that the jury followed the trial court's instructions. See Taylor, supra. Accordingly, we do not find any reversible error in this regard.
Finally, the appellant argues that the following statements by the prosecutor were arguments not based on the evidence:
"[Brian Newby] thought we had him on tape talking to Joey Wilson when Joey told him to finish the job. What did he mean? Did he mean finish whipping *901 those people? You know, in another generation, ladies and gentlemen, if this had happened in another generation way back, a guy like Joey Wilson would have went over and called these guys out one on one and whipped them. In another generation he would have gone over with a bunch of thugs and whipped them. They don't do that anymore, ladies and gentlemen. They go over with guns and they kill them. Why? I don't know. Finish the job. What job? I think you know what job he was talking about."
(R. 1610) (emphasis added). The prosecutor then went on to say:
"Ladies and gentlemen, I submit to you that there are veterans of wars who have spent a full year in combat theater and not seen the carnage, slaughter, the cold-blooded killing, that these young people have seen to traumatize them for the rest of their lives. They can tell you what happened. They may not be able to give you all the fine details, but they will tell you exactly what happened. Were they terrified? Yes. Could you maybe push Mike Skirchak around a little bit on cross-examination? Yes. Maybe Brian Newby, Khristian Ashley, you can push them around a little bit, but wait a minute. Try to push Ashley Rutherford around a little bit on cross-examination. Try to push Michelle around a little bit on cross-examination, and see what it gets you. What changed about their testimony under that laborious cross-examination and suggestions as to what they might have said? They never changed their story. They told you what happened."
(R. 1612.) Because the appellant did not object to these statements at trial, we review them for plain error. See Rule 45A, Ala. R.App. P. "`In order to constitute reversible error, improper argument must be pertinent to the issues at trial or its natural tendency must be to influence the finding of the jury.' Mitchell v. State, 480 So.2d 1254, 1257-58 (Ala.Cr.App.1985) (citations omitted). `To justify reversal because of an attorney's argument to the jury, this court must conclude that substantial prejudice has resulted.' Twilley v. State, 472 So.2d 1130, 1139 (Ala.Cr.App. 1985) (citations omitted)." Coral, 628 So.2d at 985. Both of these comments were analogies drawn by the prosecutor. The prosecutor used the analogy about previous generations while arguing his impression about what the phrase "finish the job" meant. In his combat analogy, the prosecutor appears to have been arguing that the jurors should consider the extent of the trauma the surviving victims endured when weighing their testimony. Because we do not conclude that these comments resulted in substantial prejudice to the appellant, we find that these comments did not constitute plain error.

G.
Seventh, the appellant contends that the prosecutor improperly instructed the jury on critical areas of law. Specifically, he contends that the prosecutor's definition of accomplice liability "grossly expanded the scope of [his] liability under a complicity theory by instructing the jury that he is also guilty of capital murder, even if he merely `encouraged' the commission of the offense." (Appellant's brief at p. 70.) While explaining complicity to the jury, the prosecutor stated:
"What it means basically is you are held legally accountable for the actions of another, if you either aided and abetted the other in that criminal act. If you encouraged him, if you procured him, or assisted in any way in the commission of that act. In opening statement you never heard me say that we expect the evidence to be that this particular defendant killed each and every one of these people in that room by his own hand. I never said that. I knew it wasn't true. But with complicity, he is responsible. He is responsible, even though by his own hand he did not actually kill each one. He is responsible if you find that he aided and abetted or that he procured *902 it, he encouraged it, he assisted in it, he's held responsible."
(R. 1531) (emphasis added). The terms "aid and abet" encompass "all assistance rendered by acts, or words of encouragement, or support or presence, actual or constructive, to render assistance should it become necessary, and no particular acts are necessary." Prantl v. State, 462 So.2d 781, 783 (Ala.Cr.App.1984) (citing Watkins v. State, 357 So.2d 156 (Ala.Cr.App.1977), cert. denied, 357 So.2d 161 (Ala.1978)). Thus, the prosecutor's use of the term "encouragement" did not grossly expand the realm of conduct that would make him responsible for Acklin's actions. Additionally, after the appellant objected, the trial court immediately instructed the jury as follows:
"Ladies and gentlemen, I am going to charge you on what the law is. Take the law as I charge you, not the way counsel describes the law to you, unless it conforms with what I tell you."
(R. 1531-32.) As we have previously stated, we presume that the jury followed the trial court's instructions. See Taylor, supra. Finally, the prosecutor further stated to the jury:
"And I by no means am pretending to give you the word-for-word definition. I am trying to talk to you in everyday language of what the law is. Certainly, listen to what the Judge says. Listen to the exact legal definition of these concepts."
(R. 1532.) Accordingly, the appellant's argument is without merit.

H.
Eighth, the appellant contends that the prosecutor improperly vouched for the credibility of his witnesses. In Price v. State, 725 So.2d 1003 (Ala.Cr.App. 1997), aff'd, 725 So.2d 1063 (Ala.1998), cert. denied, 526 U.S. 1133, 119 S.Ct. 1809, 143 L.Ed.2d 1012 (1999), we held as follows:
"There was no impropriety by the prosecutor in making these comments because they were grounded in the evidence and were proper inferences from the evidence; moreover, the credibility of witnesses is proper subject matter for arguments to the jury. In Cross v. State, 536 So.2d 155 (Ala.Cr.App.1988), the district attorney, in closing argument to the jury, stated that the defendant's son had lied and that a deputy sheriff had told the truth, further commenting that the deputy sheriff had no reason to lie. This Court noted that the testimonies of defense witnesses and the deputy sheriff, who was a State's witness, were in conflict and were properly opened to comment during closing argument. This Court stated:
"`[T]he testimony was in evidence and the prosecutor could comment on this, since her comments were supported by the evidence. Moreover, the credibility of a witness is a legitimate subject of comment during closing arguments In Milton v. State, 417 So.2d 620 (Ala.Cr.App.1982), the prosecution called the appellant's witness a "blatant liar"; we held that the prosecutor's argument or comment was within the scope and limit of argument, because the argument went to the credibility of the witness. 417 So.2d at 623. In Clark v. State, 462 So.2d 743, 747 (Ala.Cr.App.1984), we held that when a party places a witness on the stand, he vouches for his credibility, but does not personally vouch for the witness. In the case at bar, the prosecutor was arguing to the jury as to the effect of the witness's testimony, but was not personally vouching for [the witness's] credibility.
"`Therefore, the trial court did not err in allowing the prosecution to attack the credibility of the appellant's witness, nor did the prosecutor personally vouch for the credibility of the State's witness.'
"536 So.2d at 159-60. See also Ex parte Rieber, 663 So.2d 999 (Ala.1995), cert. denied, 516 U.S. 995, 116 S.Ct. 531, 133 L.Ed.2d 437 (1995).

*903 "Similarly in DeBruce v. State, 651 So.2d 599 (Ala.Cr.App.1993), aff'd, 651 So.2d 624 (Ala.1994), the prosecutor argued to the jury that a State's witness was telling the truth and that the robbery/murder occurred just as the witness had testified. The prosecutor further argued that a defense witness was not telling the truth, but had presented `a baldfaced lie.' Id. at 610. This Court found no impropriety by the prosecutor's comments, stating:
"`A distinction must be made between an argument by the prosecutor personally vouching for a witness, thereby bolstering the credibility of the witness, and an argument concerning the credibility of a witness based upon the testimony presented at trial. "[P]rosecutors must avoid making personal guarantees as to the credibility of the state's witnesses." Ex parte Parker, 610 So.2d 1181 (Ala. 1992). See Ex parte Waldrop, 459 So.2d 959, 961 (Ala.1984), cert. denied, 471 U.S. 1030, 105 S.Ct. 2050, 85 L.Ed.2d 323 (1985).
"`"`Attempts to bolster a witness by vouching for his credibility are normally improper and error.'... The test for improper vouching is whether the jury could reasonably believe that the prosecutor was indicating a personal belief in the witness credibility.... This test may be satisfied in two ways. First, the prosecution may place the prestige of the government behind the witness, by making explicit personal assurances of the witness' veracity.... Secondly, a prosecutor may implicitly vouch for the witness' veracity by indicating that information not presented to the jury supports the testimony."
"`United States v. Sims, 719 F.2d 375, 377 (11th Cir.1983), cert. denied, 465 U.S. 1034, 104 S.Ct. 1304, 79 L.Ed.2d 703 (1984).
"`Here, the district attorney did not give any personal assurance of McCant's veracity and did not imply that he had information that had not been presented to the jury that supported McCant's testimony. "The credibility of a witness is a legitimate subject of criticism and discussion." Flint v. State, 370 So.2d 332, 335 (Ala. Cr.App.1979). Here, as in Smith v. State, 344 So.2d 1239, 1242 (Ala.Cr. App.), cert. denied, 344 So.2d 1243 (Ala.1977), "[t]he prosecutor's remarks were grounded on some testimony given by the witness himself." See also Watson v. State, 398 So.2d 320, 328 (Ala.Cr.App.1980), cert. denied, 398 So.2d 332 (Ala.), cert. denied, 452 U.S. 941, 101 S.Ct. 3085, 69 L.Ed.2d 955 (1981) (reference in closing argument to defendant as a "bald face liar" was "a hard blow but it was not foul").'
"DeBruce v. State, 651 So.2d at 610-611. See also Hunt v. State, [659 So.2d 933, 942-43 (Ala.Crim.App.1994)]."
725 So.2d at 1029-31. We have thoroughly reviewed the comments about which the appellant complains and conclude that no reversible error occurred. The comments dealing with the witnesses' credibility and the weight to assign witness testimony were based on the evidence presented at trial. Furthermore, the prosecutor did not personally vouch for the witnesses' credibility or suggest that his knowledge of the witnesses' credibility came from facts not in evidence.
Finally, the appellant argues that, in making the following statement, the prosecutor vouched for the State's witness and placed his own credibility into issue:
"Yes, we wanted to try [the appellant] first because he is the one that caused it. He is the one who led it, and it's his show. And he tells you well, when they try Nick Acklin they will try to lay it on him. Ladies and gentlemen, I resent the insinuation that the State contrives evidence to make it fit to a particular *904 case, that we get witnesses to say what we want them to say. I should take that as a personal offense, but I am accustomed to it because I hear it all the time. If you think that people that work for the State of Alabama, the District Attorney's office, the Madison County Sheriffs Department, are changing their stories, or contriving testimony, making up stories, telling people what to say, then, ladies and gentlemen, the wrong person is on trial. We need to be charged. Those deputies need to be charged The investigators need to be charged."
(R. 1598-99) (emphasis added). During closing arguments, defense counsel repeatedly suggested that the surviving victims' perception of the shootings may have been influenced by their discussions with police officers, investigators, and the district attorney's office. At one point, defense counsel said, "What have they perceived, what has been stuck in their head from talking to the District Attorney's office, talking to law enforcement?" (R. 1571-72) (emphasis added). Additionally, defense counsel also suggested that the prosecution would change its position on the level of Acklin's responsibility for the crimes during Acklin's subsequent trial. After reviewing the statement in light of the entire closing arguments, it is clear that the prosecutor's comment was merely a reply in kind to defense counsel's closing arguments. Therefore, the appellant's argument is without merit.
For the foregoing reasons, we conclude that the prosecutor did not improperly vouch for the credibility of the State's witnesses.

I.
Ninth, the appellant contends that the prosecutor improperly injected penalty-phase issues during the guilt phase of the trial. During his guilt-phase rebuttal, the prosecutor stated,
"This has been described as murder over a cell phone, and when you listen to the evidence probably the saddest thing was it was less than that. It wasn't even a murder over a cell phone. I think it was a mindless murder over some kind of distorted image of tough guy stuff. You can't understand it. You don't have to understand it, but you can't. It's impossible. You look at it and you thinkyou know, after they tortured and humiliated and beat these people, these defenseless people, they didn't bust them. They didn't buck them, they didn't bust them, they didn't kill them, they executed them. Look at the crime scene photos. You tell me whoever, other than Mikey Skirchak, whoever even moved from where they sat almost all night. They executed them. Gunpowder stippling, close-range shots, to the head. Everyone was shot in the head, except Brian Carter. Joey missed three inches low, shot him through the neck. You wouldn't treat a dog the way they treated them."
(R. 1562-63) (emphasis added). Because the appellant did not object to the statements at trial, we will review them for plain error. See Rule 45A, Ala. R.App. P. In Taylor v. State, 666 So.2d 36 (Ala.Cr. App.1994), aff'd, 666 So.2d 73 (Ala.1995), cert. denied, 516 U.S. 1120, 116 S.Ct. 928, 133 L.Ed.2d 856 (1996), we held:
"The district attorney's characterizations of the crime as a `massacre,' the crime scene as a `slaughterhouse,' and the appellant as a `graverobber' constituted proper inferences from the evidence. R. 798, 7999, 1115. The law is clear that `"[i]n a proper case, the prosecuting attorney may characterize the accused or his conduct in language which, although it consists of invective or opprobrious terms, accords with the evidence of the case.' Nicks v. State, 521 So.2d 1018, 1023 (Ala.Cr.App.1987), affirmed, 521 So.2d 1035 (Ala.), cert. denied, 487 U.S. 1241, 108 S.Ct. 2916, 101 L.Ed.2d 948 (1988)."
666 So.2d at 65. The prosecutor's characterization of the murders as "executions" *905 was based on the evidence presented at trial and constituted a proper inference from the evidence. See Coral, supra. Therefore, the appellant's argument is without merit.

J.
Tenth, the appellant contends that the prosecutor improperly mischaracterized the arguments of defense counsel. During closing arguments, the following occurred:
"[Prosecutor]: And if you believe [the witnesses] beyond a reasonable doubt, not as has been referred to you beyond any and all possible doubt. The Judge will not say that to you.
"[Defense counsel]: Your Honor, I respectfully state to the Court that I never made that statement. He full well knows that I said beyond any and all reasonable doubt.
"The Court: Ladies and gentlemen, you have heard the evidence. Use your recollection as to what was or what was not said.
"[Prosecutor]: Yes, use your recollection and remember whether or not you heard possible doubt."
(R. 1594-95.) During his closing arguments, defense counsel told the jury that the State had the burden of proving the appellant was guilty "beyond any and all possible reasonable doubt." (R. 1565.) "[S]tatements of counsel in argument to the jury must be viewed as delivered in the heat of debate; such statements are usually valued by the jury at their true worth and are not expected to become factors in the formation of the verdict. Orr v. State, 462 So.2d 1013, 1016 (Ala.Cr. App.1984); Sanders v. State, 426 So.2d 497, 509 (Ala.Cr.App.1982)." Bankhead v. State, 585 So.2d 97, 106-07 (Ala.Cr.App. 1989), aff'd in relevant part, 585 So.2d 112, 127 (Ala.1991), rev'd on other grounds, 625 So.2d 1146 (Ala.1993). Furthermore, the trial court immediately instructed the jurors that they should rely upon their own recollections of what defense counsel said. Accordingly, the appellant's argument is without merit.
The appellant also argues that the prosecutor mischaracterized defense counsel's closing argument as suggesting that he was the victim in this case. Specifically, he argues that this argument was improper because he "admitted some level of [his] culpability for the offense." (Appellant's brief at p. 75.) Because the appellant did not object at trial to the statements in question, we will review them for plain error. See Rule 45A, Ala. R.App. P. During the State's rebuttal argument, the prosecutor stated:
"Counsel tells you that Ashley hated Joey Wilson's guts. That may be or it may not be. I don't know. He didn't say that. I cannot see where he would have a lot of love for him. Everybody saidI think the insinuation was, after they were prodded and encouraged by the Madison County Sheriff's Department, everybody when asked who did it said Joey Wilson. That's still a good answer, ladies and gentlemen. Nobody prompted that from them, I don't think. They say that all three went after poor ole Joey Wilson. He is the real victim, they would have you think."
(R. 1604-05) (emphasis added). During the defense's closing arguments, counsel stated:
"I think it's pretty obvious that Ashley Rutherford hated Joey Wilson's guts from a long time back, but they still spoke, they still interacted. Why would Ashley Rutherford, knowing full well that Nick Acklin just put a gun to his head and pulled the trigger, and seeing nothing else that went on, upon his first contact with law enforcement he said, `Joey Wilson did it.' Now does that not say that somebody has started out to make sure that no matter what the facts are, Joey Wilson is going to suffer the consequences for it all. I think that's as clear a statement of that as you can find, or that you will ever be able to find. He sat right up here and told you that's *906 exactly what he did, knowing full well that otherwise Nick Acklin shot him."
(R. 1574-75.) Furthermore, defense counsel had previously suggested that the witnesses' perception of events had been influenced by the district attorney and law enforcement. After reviewing the prosecutor's statement in the context of the entire trial, we do not find any plain error in this regard.

K.
Eleventh, the appellant contends that the prosecutor improperly vouched for the strength of the State's case during the penalty phase. He did not object to the complained of statements at trial. Therefore, we review this claim for plain error. See Rule 45A, Ala. R.App. P. During his opening arguments, the prosecutor stated:
"The first [aggravating circumstance] is that the defendant, Joey Wilson, knowingly created a great risk of death to many people by his actions. As the Judge has said, the State does not have to put on evidence, if you have already heard the evidence in the main trial, which you did. I expect we probably won't put on that much evidence. We certainly won't put on any evidence that has to do with what happened in that room. I don't expect that we are going to call any of the eyewitnesses back to the stand. But that aggravating circumstance is pretty much what it says it is, and you will recall there were seven innocent people in that room, seven people other than Joey Wilson, Corey Johnson, and Nick Acklin. You recall, of course, that four of the seven are not with us today. We have the burden to prove that circumstances to you beyond a reasonable doubt. I believe just from the facts as they are it's going to be pretty clear to you that that's met."
(R. 1685-86) (emphasis added). The prosecutor's statement was a proper comment on the character and the strength of the evidence presented by the State. See Price, supra. Additionally, we view these comments as an expression of the prosecutor's reasonable impressions from the evidence. See Ex parte Rieber, 663 So.2d 999 (Ala.), cert. denied, 516 U.S. 995, 116 S.Ct. 531, 133 L.Ed.2d 437 (1995). Therefore, the prosecutor's statement does not rise to the level of plain error.

L.
Twelfth, the appellant contends that the prosecutor improperly argued that the death sentence was a proper means of self-defense. Specifically, he argues that the prosecutor's argument comparing the death penalty to self-defense played "on the jury's fears that Madison county is awash in potential murderers, and that the jury must send verdicts to discourage potential scofflaws who may contemplate committing crimes in the county." (Appellant's brief at p. 77.) Because the appellant did not object to these comments at trial, we review them for plain error. See Rule 45A, Ala. R.App. P. In Kuenzel v. State, 577 So.2d 474 (Ala.Cr. App.1990), aff'd, 577 So.2d 531 (Ala.), cert. denied, 502 U.S. 886, 112 S.Ct. 242, 116 L.Ed.2d 197 (1991), we held that a similar argument constituted a general appeal for law enforcement and was well within the wide latitude granted to prosecutors during closing arguments. See also Ingram v. State, 779 So.2d 1225 (Ala.Cr.App.1999). Accordingly, the prosecutor's argument did not rise to the level of plain error.

M.
Thirteenth, the appellant contends that the prosecutor improperly elicited testimony about offenses not attributable to him. During the State's direct examination of Michelle Hayden, the following occurred:
"[Prosecutor]: Did [Nick Acklin] make sexual advances toward you? Just answer yes or no.
"[Defense counsel]: Your Honor, I would object. I don't see that this has *907 any relevance toward the charges as they are charged against Joey Wilson in this case.
"[Prosecutor]: It's in the statement Your Honor, that they have put into evidence.
"The Court: Overruled.
"[Hayden]: Yes.
"[Prosecutor]: Was he successful?
"[Hayden]: No.
"[Prosecutor]: On how many occasions did he make sexual advances toward you?
"[Hayden]: Several times.
"[Prosecutor]: And on each occasion he was not successful?
"[Hayden]: That's right.
"[Prosecutor]: Do you know of his making some statement to everybody in the room about sexual contact with you?
"[Defense counsel]: Hearsay, Your Honor. I object.
"The Court: Sustained.
"[Prosecutor]: It's in their statement, Your Honor, that they put into evidence.
"The Court: I sustain the objection. I sustain as to hearsay.
"[Prosecutor]: You had no actual sexual contact with Nick Acklin; is that what you are saying?
"[Hayden]: That's not entirely true because he did
"[Defense counsel]: Your Honor, here again, I object, the same objection as previously stated.
"The Court: Overruled.
"[Hayden]: He put his hands on my breasts and was fondling me and I wasI kept telling him no, and I was pushing him away.
"[Prosecutor]: But if he said in a statement, that is, to this jury that there was a sexual act that took place between he and you, would that be true?
"[Hayden]: No.
"[Defense counsel]: Your Honor, I have objected to this and the Court has sustained my objection. I would ask that counsel be instructed to stay away from it where I won't have to keep going over and over it.
"The Court: Sustained."
(R. 1431-33.) During his cross-examination of Skirchak, defense counsel offered Skirchak's statement to law enforcement officers into evidence. The statement, which the trial court admitted into evidence, contained an assertion that, "Nick came back in and said, `Your girlfriend gives good head,' I believe he forced her to suck his dick [at] gunpoint." (C.R.310.) Apparently, the prosecutor was attempting to correct the possible misconception that Acklin had sodomized Hayden. Therefore, the appellant's argument that this line of questioning constituted prosecutorial misconduct is without merit. Furthermore, the following occurred during defense counsel's cross-examination of Hayden:
"[Defense counsel]: Joey didn't make any kind of sexual advances toward you, did he?
"[Hayden]: No.
"[Defense counsel]: Joey didn't direct Nick Acklin to make sexual advances toward you, did he?
"[Hayden]: No."
(R. 1469.) Because Hayden unequivocally denied that the appellant was involved in Acklin's alleged sexual advances toward her, error, if any, in the admission of this testimony was harmless. See Rule 45, Ala. R.App. P.

N.
Fourteenth, the appellant contends that the prosecutor improperly elicited testimony about his mental state. The first instance occurred during Investigator Kevin Turner's testimony about his interview with the appellant.
"[Prosecutor]: What was his demeanor, Kevin? How did he appear?

"[Turner]: To me, he appeared laid back. I have talked to him several times on the street, and he has always *908 seemed as a laid back individual. He hadyou know, it was just another night to him. I went on to ask him a second time who did the shooting.
"[Prosecutor]: And what did he say?
"[Turner]: He said, `K.T., that's my crew y'all got locked up out there. I'm not going to turn and rat on them.'
"[Prosecutor]: Did he say anything else?
"[Turner]: No, sir. After he said that he said, `I can't remember anything else.' That was the end of the conversation.
"[Prosecutor]: Did he complain to you about any ailments he had?
"[Turner]: Any ailments? I think he talked about some breathing problem at one time.
"[Prosecutor]: To you or to somebody else?
"[Turner]: He said something about he thought it might be asthma. He said he was having a hard time breathing.
"[Prosecutor]: Did he appear to you to be having a hard time breathing?
"[Turner]: No, sir.
"[Prosecutor]: Did you say he was kind of laid back?

"[Turner]: Yes, sir."
(R. 921-23) (emphasis added). The next instance about which the appellant complains took place during the State's direct examination of Michelle Hayden.
"[Prosecutor]: Who was in control of these people who entered your house?
"[Defense counsel]: Objection, Your Honor.
"The Court: Overruled.
"[Prosecutor]: You may answer.
"[Hayden]: Joey Wilson. This wouldn't have happened without Joey Wilson.
"[Defense counsel]: Objection, Your Honor. I move to strike.
"The Court: What are the grounds of your objection?
"[Defense counsel]: Your Honor, this witness is making a conclusion, a mental operation, about someone else's mind or state.
"The Court: I sustain. Ladies and gentlemen, disregard that last sentence. Do not consider that in your deliberations.
"[Prosecutor]: Why is it, Michelle, that you say Joey Wilson was in control?
"[Hayden]: Just for an example, it was [said] several times that it was Joey's crew.
"[Prosecutor]: Who said that?
"[Hayden]: That was out of Joey's mouth.
"[Prosecutor]: Who said that, Joey?
"[Hayden]: Yes, Joey. But in particular I remember a time when Johnny wasthis was before Johnny was beaten so badly. He was beaten, but he wasn't beaten as badly as what I just described. And Joey told Corey, `Hey, Corey, he's not bleeding. I want to see blood.' Then Corey said, `What?' He said, `I want to see blood.' That's when Corey got on him.
"[Prosecutor]: What was his general demeanor throughout the night, Joey Wilson?
"[Hayden]: Joey told everyone what to do. They followed him to whichever person he was picking on or, you know, the one he was taunting. They followed him and stood behind him like a bodyguard. It was like they were bodyguards or something. They just followed him. Joey was really jittery or excited, and he was sweating and he was justI've never seen him like that. He seemedhe was angry, shouting, and he was bullying."
(R. 1426-28.) After reviewing the prosecutor's questions in context, it appears that he was attempting to elicit testimony about the appellant's demeanor and actions on the occasions in question, not his state of mind. Because this type of evidence is *909 admissible, the prosecutor's questions did not amount to prosecutorial misconduct.

O.
Fifteenth, the appellant contends that the prosecutor improperly challenged the jury with false options. Specifically, he argues that the prosecutor erred in stating, "[I]f you think we are a bunch of crooks, then go in there and find [the appellant] not guilty." (R. 1613.) Because the appellant did not object to this statement at trial, we will review it for plain error. See Rule 45A, Ala. R.App. P. During closing arguments, the prosecutor stated:
"You, ladies and gentlemen, have the opportunity to take all this evidence and look at it and discuss it, evaluate it, talk about the testimony, gauge the credibility of the witnesses and arrive at the ultimate decision. No, it's not going to be easy. It's not an easy thing. Nobody said it was going to be. You are sworn to do a duty just like we are. Everybody here has their duty. People that sit at this table have their duty. I don't fault them for that. Counsel does their job with what they have. We do our job with what we have. If you believe we manufacture stuff and bring it to you, if you believe we are dishonest, if you think we are a bunch of crooks, then go in there and find [the appellant] not guilty. Weigh the evidence that you have heard."
(R. 1613.) As we previously discussed, defense counsel repeatedly insinuated that the district attorney was manipulating the order of the appellant's and Acklin's trials. Counsel also insinuated that the State would change its theory of who was responsible for the murders during Acklin's trial. Additionally, counsel insinuated that the district attorney and law enforcement officers had influenced the victims' perceptions of events on the night in question. The prosecutor's statements were merely a reply in kind to defense counsel's insinuations during his closing arguments. The appellant argues that "[t]he jury, by the prosecutor's argument, had no option but to find that the prosecutor did not exert improper influence" because the argument left the jury only with the option of acquitting him if it found such influence. (Appellant's brief at p. 80.) The trial court instructed the jury as follows:
"Now, in weighing the testimony, ladies and gentlemen, you are authorized to consider the manner and demeanor of the witnesses, the ability of the witness to relate to you the things that he or she claims to have seen or heard.
"You are authorized to take into account any friendship a witness has with any other party, if you find any. You may consider any degree of kinship that you find between one witness and another, if you find any.
"You may consider any interest that a witness might have in the outcome of this case. You may take into account whether a witness has been shown to be biased or prejudiced toward any party in the case. You may also consider whether a witness has been contradictory or not. If you find that there has been a contradiction, you would consider that in determining the weight that you would give the testimony of that witness. Now, a mere contradiction standing alone would not authorize you to disregard the testimony of that witness entirely. But should you find that a witness has wilfully and intentionally testified falsely to a material fact, then as to that witness you are privileged to disregard his or her entire testimony if you see fit. You don't have to do that, but it is your privilege to do so if you choose to do so."
(R. 1619-20.) Furthermore, "`[t]o justify reversal because of an attorney's argument to the jury, this court must conclude that substantial prejudice has resulted.' Twilley v. State, 472 So.2d 1130, 1139 (Ala.Cr. App.1985) (citations omitted)." Coral, 628 So.2d at 985. Therefore, we conclude that the appellant's argument that the jury was *910 effectively denied the ability to find that the district attorney had acted improperly is without merit. Accordingly, we do not find any plain error in this regard.

P.
Sixteenth, the appellant contends that the cumulative effect of the above-alleged errors requires a reversal. We have reviewed the above-alleged errors and have not found any that were prejudicial to the appellant. Therefore, this argument is without merit.

XI.
The appellant's eleventh argument is that the jury was improperly informed about the case outside of his or the trial court's presence because the trial court did not control the venire. Specifically, he contends that "veniremembers had discussed the case outside the courtroom, that they had been discussing the case with people who had been struck from the jury, and that the circuit clerk's own clerk had spoken with some of the veniremembers about the case." (Appellant's brief at p. 81.) Because the appellant did not present this claim to the trial court, we review it under the plain error rule. See Rule 45A, Ala. R.App. P.
During voir dire examination, the following occurred:
"[Defense counsel]: Did you personally have any conversation with any of the jurors that were excused from the panel that originally sat in this case on Monday? Did you have any conversation with any of those excused jurors?
"[Veniremember C.M.]: Probably, but I don't remember exactly what.
"[Defense counsel]: Well, let me ask you this: Did you have any conversations with anyone before Tuesday when you were sent down here on this panel concerning this case?
"[Veniremember C.M.]: Other than conversations in the jury room.
"[Defense counsel]: So are you saying there was general conversation concerning this case going on in the jury venire room, and you were aware of that or a part of it?
"[Veniremember C.M.]: Very general.
"[Defense counsel]: That was occurring when, on Monday?
"[Veniremember C.M.]: I don't remember.
"[Defense counsel]: I am trying to remember what time you folks were brought down here. It was Tuesday afternoon, was it not?
"[Veniremember C.M.]: Yes.
"[Defense counsel]: So the conversations you are speaking of could have been Monday or possibly even early Tuesday morning or early Tuesday afternoon?
"[Veniremember C.M.]: Tuesday morning, I think.
"[Defense counsel]: Were you aware on Tuesday that there were jurors back in your midst that had been excused from that panel?
"[Veniremember C.M.]: Yes.
"[Defense counsel]: Can you give the court any judgment, guesstimate or whatever that you are able to, about how many jurors it appeared as though there were engaged in that general conversation about this case?
"[Veniremember C.M.]: No, sir.
"[Defense counsel]: You just don't have any idea?
"[Veniremember C.M.]: No.
"[Defense counsel]: Thank you. Now, let me ask the rest of you this: Number one, did any of you have any, no matter what type it was, conversation with any of the excused jurors from the first panel in this case, or any other juror or person regarding this case prior to being sent down here on this panel? Yes, ma'am. You are [D.B.]?
"[Veniremember D.B.]: Yes.

*911 "[Defense counsel]: And you had some conversation with someone?
"[Veniremember D.B.]: It's pretty boring up there.
"[Defense counsel]: I understand that. That's why most folks bring a book.
"[Veniremember D.B.]: It was just in general. It had more to do with what was the process than the actual case.
"[Defense counsel]: But you did have somewhat of a conversation with someone else, being another juror, I take it, or jurors?
"[Veniremember D.B.]: Yes.
"[Defense counsel]: And it was about this case?
"[Veniremember D.B.]: More about the procedure than anything else.
"[Defense counsel]: All right. And if you recall, about how many folks did you have conversation with?
"[Veniremember D.B.]: Probably only one that had come back.
"[Defense counsel]: How about any that had not been down here?
"[Veniremember D.B.]: We were all not wanting to come.
"[Defense counsel]: Okay. I understand that. Were you talking in general about hope they don't call me, things of that nature?
"[Veniremember D.B.]: Right.
"[Defense counsel]: Being specifically referencing this particular case?
"[Veniremember D.B.]: Yes.
"[Defense counsel]: Was this before any panel was sent down, or was this when other jurors started coming back up from the first panel?
"[Veniremember D.B.]: Well, we had talked about it.
"[Defense counsel]: For the entire time?
"[Veniremember D.B.]: Yes.
"[Defense counsel]: Well, would it be safe and fair to make a statement that, generally speaking, you were as a group pretty well aware that this case was pending when everybody came in there Monday morning?
"[Veniremember D.B.]: I didn't know until I got here.
"[Defense counsel]: But somebody informed you, didn't they?
"[Veniremember D.B.]: Yes.
"[Defense counsel]: So there was a general conversation going around the venire room, I take it?
"[Veniremember D.B.]: Yes.
"[Defense counsel]: But, as I am understanding you in particular, you had no specific conversation about details, about the persons involved, about the crazy lawyers involved, anything like that?
"[Veniremember D.B.]: No. It was mainly about the jury process that we were curious about.
"[Defense counsel]: Ms. [R.T.].
"[Veniremember R.T.]: It was just general conversation. I think Sunday night or so on the news it was noted that there was a capital murder case coming up. But it was general conversation, like she said, that maybe I will get skipped.
"[Defense counsel]: Okay. Let me ask you while you are standing, I'm taking it, then, that you saw some news reports on Sunday?
"[Veniremember R.T.]: It was just that the case was coming up.
"[Defense counsel]: Do you recall what station it was on?
"[Veniremember R.T.]: Not really.
"[Defense counsel]: Did you then see, hear or read anything about this case on Monday?
"[Veniremember R.T.]: No, sir. The jury room upstairs, it was basically
"[Defense counsel]: I am speaking of Monday night.

*912 "[Veniremember R.T.]: No, I did not. I didn't get home until 10 o'clock on Sunday.
"[Defense counsel]: Thank you. Yes, ma'am. You are Ms. [G.H.]?
"[Veniremember G.H.]: Yes. I just want to mention that when Mr. Billy Harbin
"[Defense counsel]: Billy D. Harbin, Circuit Court Clerk?
"[Veniremember G.H.]: He told us what our duties might be. Actually, he is the one that said that some of us might be on a capital murder case.
"[Defense counsel]: So he is the one that got everything stirred up.
"[Veniremember G.H.]: I mean, that's where I first heard it.
"[Defense counsel]: And the record will reflect that it's Billy Harbin's fault.
"Now. Mr. Harbin didn't tell you any details about the case, did he?
"[Veniremember G.H.]: No, no details. He was just explaining what our duties might be, and he mentioned that some of us might be on a capital murder case. Then everybody said, you know, `I hope it's not me.'
". . . .
"[Veniremember L.M.]: There was a lady in the elevator that mentioned that they had not picked a jury for this case, that she was stricken. That's about all there was to it."
(R. 502-11.) From this discussion, it is clear that the veniremembers simply discussed the procedural aspects of the case rather than the facts. Further, there is no indication that anything the circuit clerk stated to the veniremembers was improper. Rather, it appears that he merely explained the types of cases the veniremembers might be hearing. Finally, the trial court repeatedly instructed the jury to make its decision based on the evidence presented and not based on any extraneous influences. We presume that the jurors followed those instructions. See Taylor v. State, 666 So.2d 36 (Ala.Cr.App. 1994), aff'd, 666 So.2d 73 (Ala.1995), cert. denied, 516 U.S. 1120, 116 S.Ct. 928, 133 L.Ed.2d 856 (1996). Because the appellant has not shown that the conversations improperly influenced the jury's verdict in this case, we do not find any plain error in this regard.

XII.
The appellant's twelfth argument is that the trial court made several errors that prevented him from seating an impartial and fair-minded jury.

A.
First, the appellant contends that the trial court erred when it did not remove three veniremembers for cause. Specifically, he contends that the responses veniremembers J.B., L.M., and S.G. gave during voir dire examination established that they were not fit to serve on the jury and that the trial court erred in refusing to excuse them for cause. Therefore, he argues that he was improperly forced to use peremptory challenges to remove them from the venire.
In reviewing the appellant's claims, we apply the following principles:
"Section 12-16-150, Code of Alabama 1975, provides that, when a juror `has a fixed opinion as to the guilt or innocence of the defendant which would bias his verdict,' a challenge for cause is proper. Nobis v. State, 401 So.2d 191 (Ala.Crim. App.), cert. denied, 401 So.2d 204 (Ala. 1981). The juror must have more than a bias, or fixed opinion, as to the guilt or innocence of the accused. The juror's opinion must be fixed to the point that it would bias the verdict which the juror would be required to render. Johnson v. State, 356 So.2d 769 (Ala.Cr.App. 1978); McCorvey v. State, 339 So.2d 1053 (Ala.Cr.App.), cert. denied, 339 So.2d 1058 (Ala.1976); Tidmore v. City of Birmingham, 356 So.2d 231 (Ala. Crim.App.1977), cert. denied, 356 So.2d 234 (Ala.1978)."
*913 Thomas v. State, 539 So.2d 375, 380 (Ala. Cr.App.), aff'd, 539 So.2d 399 (Ala.1988), cert. denied, 491 U.S. 910, 109 S.Ct. 3201, 105 L.Ed.2d 709 (1989). Also,
"`[u]ltimately, the test to be applied is whether the juror can set aside [his] opinions and try the case fairly and impartially, according to the law and the evidence. This determination again is to be based on the juror's answers and demeanor and is within the discretion of the trial judge. Thus, a prospective juror should not be disqualified for prejudices or biases if it appears from his or her answers and demeanor that the influence of those prejudices and biases can be eliminated and a verdict rendered according to the evidence.'"
Marshall v. State, 598 So.2d 14, 16 (Ala.Cr. App.1991) (citations omitted) (quoting Knop v. McCain, 561 So.2d 229, 232 (Ala. 1989)).
The appellant contends that the trial court should have excused veniremember J.B. for cause because he allegedly believed the appellant should have to prove his innocence. During voir dire examination, veniremember J.B. initially stated that he did not believe that a defendant would have to prove that he was not guilty and agreed that a defendant should not be required to take the stand in his own defense. (R. 320-21.) At that time, he also stated that he was a pastor and asked to be excused because sequestration would cause a great inconvenience for him. (R. 319-20.) Later during voir dire examination, the following occurred:
"[Defense counsel]: You are familiar with the case, even back to somewhere around September of 1996?
"[Veniremember J.B.]: Yes.
". . . .
"[Defense counsel]: And what you did see, hear or read back at that time, did you formulate any kind of opinion about the case?
"[Veniremember J.B.]: No, sir.
"[Defense counsel]: Was it something that struck you as being different from other cases that you have seen in the news reports? Was there anything about it that was extraordinary to you?
"[Veniremember J.B.]: Only that it was a very heinous crime.
"[Defense counsel]: So you have heard, read, or seen reports that told you it was a very heinous crime. Is that what I am understanding?
"[Veniremember J.B.]: From the first reports that I heard, with the number of people involved.
"[Defense counsel]: And from that did you formulate any opinions about those that were accused in this case?
"[Veniremember J.B.]: No, I didn't.
"[Defense counsel]: Specifically, did you formulate any opinion about my client in this case, Joey Wilson?
"[Veniremember J.B.]: No.
"[Defense counsel]: Did you formulate any opinion in general, that from the reports I heard, that's heinous, something about those people? Did you formulate any opinion about those people based on those type of thoughts?
"[Veniremember J.B.]: Other than none other than the ones that committed it.
"[Defense counsel]: That's what I am getting at. What kinds of opinions did you formulate about those, based on those reports that you saw, heard or read?
"[Veniremember J.B.]: The only opinion I guess I formed was that this was a very evil act.
"[Defense counsel]: So would it be a fair statement to say that you have formulated an opinion, then, that Joey Wilson is an evil person, based on those reports?
"[Veniremember J.B.]: Not him because I don't know that he is the one that did it.
"[Defense counsel]: Are you saying that you have just made a general opinion *914 formulation and not a specific opinion as to a person?
"[Veniremember J.B.]: Right.
"[Defense counsel]: Has your opinion been made such that you would expect my client to show to you that he is not the person which you think he might be?
"[Veniremember J.B.]: I don't understand what you are asking me.
"[Defense counsel]: In other words, you basically said you have formulated an opinion that there is something heinous involved and there were some evil people. Is that what I am understanding?
"[Veniremember J.B.]: Right.
"[Defense counsel]: Has that opinion been formulated in your mind to the extent such that you would require me as his lawyer or my client, Joey Wilson, to show that he is not the person that you think you have in your mind?
"[Veniremember J.B.]: I would say yes.
"[Defense counsel]: You would say yes. So you would expect us and require us to put on some proof to show you that no, that's not me that the news media saidthat's not what I am. That's not what I did. You would expect us to show that to you; is that correct?
"[Veniremember J.B.]: Well, if I understood the Judge's explanation yesterday, you don't have to show that.
"[Defense counsel]: I understand what the law is and I am not arguing with you. I just want to know what your thoughts are. Okay? You have just told me, I think, that you know what the law is. I want to know how you feel. Do you feel such that you have an opinion in your head that now you feel like you are going to require us to do something to show you different?
"[Veniremember J.B.]: I would say yes.
"[Defense counsel]: And that's a definite yes. You wouldn't change your mind; is that correct?
"[Veniremember J.B.]: Yes.
"[Defense counsel]: But you do know what the law is?
"[Veniremember J.B.]: Yes, sir.
"[Defense counsel]: And you would hold us to a degree that the law says that we don't have to do. Is that essentially it?
"[Veniremember J.B.]: Yes."
(R. 547-52.) Finally, during further questioning by the prosecutor, the following occurred:
"[Prosecutor]: [J.B.], in response to the questions about this being an evil act, we sort of slid over into the area of you requiring this defendant to prove that he is innocent. Is that your understanding?
"[Veniremember J.B.]: Yes, sir.
"[Prosecutor]: Even after the Judge instructed you and you have answered two questionnaires in which you stated that you would not require the defendant to put on evidence?
"[Veniremember J.B.]: I have rethought my decision on that.
"[Prosecutor]: So your genuine belief is that to sit on this jury you would require the defendant to prove to you that he is not guilty, and you would take from him the presumption of innocence. Is that your response?
"[Veniremember J.B.]: I would presume that he is innocent, but I still think he should prove why he is not guilty.
"[Prosecutor]: Well, if he is going to have to prove to you why he is not guilty, you take away from him the presumption of innocence. Would that be correct?
"[Veniremember J.B.]: That might be true."
(R. 587-88.)
From these excerpts, it is clear that veniremember J.B. equivocated about *915 whether he thought the appellant would have to prove his innocence. As the United States Supreme Court noted in Patton v. Yount, 467 U.S. 1025, 1039, 104 S.Ct. 2885, 2893, 81 L.Ed.2d 847 (1984):
"This is not unusual on voir dire examination, particularly in a highly publicized criminal case. It is well to remember that the lay persons on the panel may never have been subjected to the type of leading questions and cross-examination tactics that frequently are employed, and that were evident in this case. Prospective jurors represent a cross section of the community, and their education and experience vary widely. Also, unlike witnesses, prospective jurors have had no briefing by lawyers prior to taking the stand. Jurors thus cannot be expected invariably to express themselves carefully or even consistently. Every trial judge understands this, and under our system it is that judge who is best situated to determine competency to serve impartially."
Based on the veniremember's responses, the trial court could have reasonably determined that J.B. was not biased against the appellant and could have, in its discretion, refused to excuse him for cause. However, even though it is not clear from the transcript of the voir dire proceedings, it appears from the strike list included in the record that the trial court did indeed excuse veniremember J.B. for cause. Certainly, that list refutes the appellant's assertion that he was forced to exercise a peremptory challenge to remove J.B. from the venire. Accordingly, the appellant's argument is without merit.
Next, the appellant argues that the trial court should have excused veniremember L.M. for cause because L.M.'s daughter's fiancé was murdered and defense counsel represented the person accused of committing the murder. Because the appellant did not challenge veniremember L.M. for cause at trial, we review this claim for plain error. See Rule 45A, Ala. R.App. P. During voir dire examination, L.M. stated that she did not have any animosity toward defense counsel, that defense counsel's participation in the previous case would not affect her decision in this case, that she would not hold the State to a higher burden of proof than is required by law, and that she would not expect the defendant to take the stand or otherwise present any defense. (R. 494-95.) From these answers, the trial court could have reasonably concluded that L.M. was not biased against the appellant. Therefore, we do not find any plain error in this regard.
Finally, the appellant contends that the trial court should have excused veniremember S.G. for cause because she knew the Hemphill family, had been to the store the family operated, and attended the church the family attended. During voir dire examination, S.G. indicated that, even though she had been to the family's store and to the church members of the family attended, she did not know the family well. Rather, she simply recognized them when she saw them. (R. 471.) Also, she stated that she would not be biased against the appellant because of any knowledge she might have about the Hemphill family. (R. 471.) In refusing to excuse S.G. for cause, the trial court specifically stated that it remembered S.G. stating that she could be fair and that she knew the Hemphill family only vaguely. (R. 537.) Knowledge of the victim's family, alone, does not justify a challenge for cause. See McKinney v. State, 654 So.2d 95 (Ala.Cr.App.1995). Therefore, the trial court did not err in refusing to excuse S.G. for cause.

B.
Second, the appellant contends that the trial court improperly denied his motion for a jury questionnaire. Although the appellant submitted a proposed questionnaire, the trial court refused to use that particular questionnaire. Instead, it asked the prosecution and defense counsel to review the jury questionnaire *916 that had been routinely used and ruled that that questionnaire, or a form thereof, would be submitted to the jury. The trial court also instructed defense counsel to review the questionnaire and to get back in touch with the court about it. After that, there is no indication in the record that defense counsel was not satisfied with the questionnaire the trial court submitted to the jury. Therefore, because the appellant did not challenge the court's ruling on this issue at trial, we review it for plain error. See Rule 45A, Ala. R.App. P.
After reviewing the questionnaire used and the voir dire examination, we conclude that the trial court did not err in refusing to use the questionnaire proposed by the appellant. The appellant has not shown what information the trial court allegedly prevented him from obtaining by using the standard juror questionnaire rather than the one he submitted. Contrary to his assertion in his brief on appeal, by utilizing both the questionnaire and voir dire examination, defense counsel was able to "discover veniremember's relationships, prejudices, biases and beliefs." (Appellant's brief at p. 89.) Accordingly, we do not find any plain error in this regard.
In a footnote, the appellant also appears to argue that the trial court erred in refusing to allow him to submit a questionnaire to another venirei.e., one that would not hear his caseto assess the effects of the pretrial publicity on the community and to support his motion for a change of venue. Again, because he did not present this claim to the trial court, we review it for plain error. See Rule 45A, Ala. R.App. P. The appellant submitted numerous documents in support of his motion for a change of venue, and he questioned the veniremembers extensively about possible bias against him due to pretrial publicity. He simply has not shown that the trial court erred in refusing his request, and we are reluctant to impose such a burden on a trial court or a venire. Accordingly, we do not find any plain error in this regard.

C.
Third, the appellant contends that the trial court improperly denied his motion for individual voir dire examination. Specifically, he contends that the court's ruling prevented him from discovering possible prejudice or bias of veniremembers.
"Appellant contends that the trial court erred in failing to grant individually sequestered voir dire of the jury venire. The trial court did permit individual voir dire in several instances but otherwise the jurors were questioned by panels. As a general rule, the decision whether to voir dire prospective jurors individually or collectively is within the sound discretion of the trial court. Waldrop v. State, 462 So.2d 1021 (Ala.Cr. App.1984), cert. denied, 472 U.S. 1019, 105 S.Ct. 3483, 87 L.Ed.2d 618 (198[5]). This discretion is limited, however, by the requirements of due process. United States v. Hawkins, 658 F.2d 279 (5th Cir.1981); Waldrop v. State. Individual questioning may be necessary under some circumstances to ensure that all prejudice has been exposed. United States v. Hurley, 746 F.2d 725 (11th Cir.1984). We have reviewed the record of the voir dire examinations and the entire jury selection procedure in this case and find that the method of empaneling the jury provided reasonable assurance that prejudice would have been discovered if present. We find no abuse of discretion in the trial court's handling of the empaneling of this jury."
Haney v. State, 603 So.2d 368, 402 (Ala.Cr. App.1991), aff'd, 603 So.2d 412 (Ala.1992), cert. denied, 507 U.S. 925, 113 S.Ct. 1297, 122 L.Ed.2d 687 (1993). "Even in capital cases, there is no requirement that a defendant be allowed to question each prospective juror individually during voir dire examination." Hallford v. State, 548 So.2d 526, 538 (Ala.Cr.App.1988), aff'd, 548 So.2d 547 (Ala.), cert. denied, 493 U.S. 945, 110 S.Ct. 354, 107 L.Ed.2d 342 (1989).

*917 "A trial court is vested with great discretion in determining how voir dire examination will be conducted, and that court's decision on how extensive a voir dire examination is required will not be overturned except for an abuse of that discretion. Fletcher v. State, 291 Ala. 67, 277 So.2d 882 (1973); Lane v. State, 644 So.2d 1318 (Ala.Cr.App.1994); Harris v. State, 632 So.2d 503 (Ala.Cr.App. 1992), affirmed, 632 So.2d 543 (Ala.1993), affirmed, 513 U.S. 504, 115 S.Ct. 1031, 130 L.Ed.2d 1004 (1995). After reviewing the record, we conclude that the trial court did not abuse its discretion in this regard."
Ex parte Land, 678 So.2d 224, 242 (Ala.), cert. denied, 519 U.S. 933, 117 S.Ct. 308, 136 L.Ed.2d 224 (1996).
After reviewing the voir dire proceedings, we conclude that the method of the examination and the empaneling of the jury "provided reasonable assurance that prejudice would have been discovered if present." Haney, 603 So.2d at 402. Before conducting group voir dire examination, the trial court allowed the parties to submit an extensive questionnaire to the veniremembers. It also allowed the parties to conduct extensive group voir dire examination and individual questioning when necessary. Therefore, there is no indication that the trial court erred and that the appellant was prejudiced by the trial court's denial of his motion for individual voir dire examination.

D.
Fourth, the appellant contends that the trial court improperly interfered with voir dire examination. Specifically, he contends that the trial court led the veniremembers, allegedly causing them to change their answers to crucial questions, and meddled in the selection process in a manner that prevented the defense from discovering the true beliefs and attitudes of the veniremembers. Because the appellant did not present this issue to the trial court, we review it for plain error. See Rule 45A, Ala. R.App. P.
After reviewing the voir dire proceedings, we conclude that the appellant's argument is without merit. Throughout the voir dire process, the trial court thoroughly instructed the veniremembers about the applicable law and questioned them about their ability to apply that law. Because some of the answers veniremembers gave on the jury questionnaire indicated that the veniremembers were confused about certain concepts, the trial court attempted to clarify those concepts during the group voir dire examination. However, we do not find any actions on the part of the trial court that interfered with the appellant's ability to discover the beliefs and attitudes, including possible bias, of the veniremembers. As we previously stated, the method of the examination and the empaneling of the jury "provided reasonable assurance that prejudice would have been discovered if present." Haney, 603 So.2d at 402. Therefore, we do not find any plain error in this regard.
For the above-stated reasons, we conclude that the trial court did not prevent the appellant from seating an impartial and fair-minded jury.

XIII.
The appellant's thirteenth argument is that the State did not provide discovery in a timely manner, thus violating Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Initially, we note the following:
"In Alabama, there is no constitutional right to discovery in a criminal case. Rule 19, Alabama Rules of Criminal Procedure, affords an accused a limited right of discovery in a pending criminal action. The extent of discovery is within the discretion of the trial court."
Ex parte Land, 775 So.2d 840 (Ala.Cr.App. 1998), overruled on other grounds, 775 So.2d 847 (Ala. 1999). In this case, the trial court granted broad discovery, as contemplated in Ex parte Monk, 557 So.2d *918 832 (Ala.1989), essentially requiring the prosecutor to maintain an open file policy except for work product materials. Although we do not condone noncompliance with discovery rules, not every violation requires a new trial. "Rule 16.5 `gives a trial judge a number of options to consider in imposing sanctions on a party who has failed to comply with the court's discovery order.'" Pettway v. State, 607 So.2d 325, 330 (Ala.Cr.App.1992) (quoting Clifton v. State, 545 So.2d 173, 178 (Ala.Cr.App. 1988)).
"The imposition of sanctions upon noncompliance with a court's discovery order is within the sound discretion of the court. United States v. Koopmans, 757 F.2d 901, 906 (7th Cir.1985); United States v. Saitta, 443 F.2d 830, 831 (5th Cir.1971); Hansen v. United States, 393 F.2d 763, 770 (8th Cir.1968). Moreover, the trial court should not impose a sanction which is harsher than necessary to accomplish the goals of the discovery rules. United States v. Gee, 695 F.2d 1165, 1169 (9th Cir.1983)."
McCrory v. State, 505 So.2d 1272, 1279 (Ala.Cr.App.1986).
First, the appellant complains that the State did not produce a portion of the police report prepared by Investigator Salomonsky, who was one of the first officers to respond to the scene of the murders. He did not present this alleged violation to the trial court. Therefore, we review it for plain error. See Rule 45A, Ala. R.App. P.
During cross-examination, Investigator Salomonsky stated that the document that had been represented to be the second page of his report was not actually part of his report. (R. 741-42.) The appellant contends that the missing portion of the report contained information that would have been helpful to his defense, including an alleged statement Ashley Rutherford made to Salomonsky that night, and that that statement would have helped him better develop his defense that Acklin was the perpetrator. However, when defense counsel asked Salomonsky whether the missing portion of the report contained Rutherford's statement, he stated that he hoped he had written it down but that he did not know for a fact that he had. He also testified that, if Rutherford had identified anyone other than the appellant as having been involved in the killings, that he would have included those additional names in the BOLO he issued. Finally, Rutherford testified that he identified only the appellant as the perpetrator on the night of the offense.
In this instance, the appellant has not shown that the State violated Brady. Specifically, he has not shown that the State intentionally suppressed the information or that the information was material to his defense. Instead, he makes assertions that are based merely on speculation and surmise. See Kuenzel v. State, 577 So.2d 474 (Ala.Cr.App.1990), aff'd, 577 So.2d 531 (Ala.), cert. denied, 502 U.S. 886, 112 S.Ct. 242, 116 L.Ed.2d 197 (1991). Therefore, we do not find any plain error in this regard.
Next, the appellant complains that the State did not provide portions of Michelle Hayden's pretrial statements during discovery. At trial, Hayden attempted to testify about something she said to the appellant on the night of the offense. However, defense counsel objected on the ground that that information had not previously been provided to the defense during discovery and moved for a mistrial. (R. 1417.) The trial court denied the motion for a mistrial, but instructed the jury as follows:
"Ladies and gentlemen, disregard that last statement. Disregard that totally from your mind. That is not evidence. Do not consider that at all in your verdict. Just totally disregard the last question and the answer, ladies and gentlemen. Do not consider that in any of your deliberations."
(R. 1417.) Shortly thereafter, defense counsel moved in limine to prohibit Hayden *919 from testifying about anything that had not previously been disclosed to the defense, and the trial court granted the motion. (R. 1418.)
Without specifically finding that the State committed a discovery violation with regard to Hayden's testimony, we conclude that the trial court's instructions and its granting of the defense's motion in limine were sufficient to correct any alleged discovery violation in this regard. For the first time on appeal, the appellant contends that the trial court's curative instruction was not sufficient to correct the error. However,
"[w]here the trial court immediately instructs the jury not to consider a fact, that instruction, in effect, removes or excludes that matter from the jury's consideration, and the prejudicial effect of the statement is deemed to be cured by such instruction. Bradley v. State, 450 So.2d 173, 176 (Ala.Cr.App.1983); Richardson v. State, 374 So.2d 433 (Ala. Cr.App.1979). The trial judge's immediate charge to the jury to disregard an impropriety raises a prima facie presumption against error. Kelley v. State, 405 So.2d 728 (Ala.Cr.App.), cert. denied, 405 So.2d 731 (Ala.1981).
"`The entry of a mistrial is not lightly to be undertaken. It should be only a last resort, as in cases of otherwise ineradicable prejudice. Where error is eradicable a mistrial is too drastic and is properly denied.' Woods. v. State, 460 So.2d 291, 296 (Ala.Cr.App.1984); Chillous v. State, 405 So.2d 58 (Ala.Cr.App. 1981).
"`When prejudicial remarks have been made, the trial judge is in a better position than the appellate court to determine whether the remarks were so prejudicial as to be ineradicable.' Chambers v. State, 382 So.2d 632, 635 (Ala.Cr.App.), cert. denied, 382 So.2d 636 (Ala.1980)."
Soriano v. State, 527 So.2d 1367, 1371 (Ala.Cr.App.1988). Accordingly, the appellant is not entitled to a new trial on this ground.
Finally, the appellant contends that the State's late disclosure of a deal it had previously made with a potential witness named Greg Tribble showed its unwillingness to comply with the trial court's discovery instructions. Again, he did not present this argument to the trial court. Therefore, we review it for plain error. See Rule 45A, Ala. R.App. P.
During a pretrial hearing, the defense argued that it had learned that the State had not produced any information about a potential witness from whom it had obtained information in the case and with whom it had made a deal to testify against the appellant. At that time, the prosecution represented to the trial court that, after the appellant had been arrested and well before the trial court had entered its discovery orders, Tribble had attempted to make a deal with the prosecutor's office. The prosecutor had had discussions with Tribble, and Tribble had agreed to work with other law enforcement officers in another matter and to testify against the appellant. However, the State had not taken any statement from Tribble at that time. Shortly thereafter, when the State learned that Tribble had not fulfilled his obligations in the other matter that was part of the agreement, it decided not to call Tribble as a witness at the appellant's trial and revoked the agreement. At the hearing, the prosecution gave the defense the information it had about Tribble and the revoked agreement. Finally, the State did not call Tribble as a witness at trial. Based on these facts, we do not find any plain error in this regard.

XIV.
The appellant's fourteenth argument is that the trial court relied on an inadequate and cursory presentence report that "failed to provide the trial court with the information necessary for an accurate penalty determination." (Appellant's brief at p. 96.) Specifically, he contends that *920 "[t]he inadequacies of the presentence report in this instance prevented the trial court from performing its constitutionally mandated weighing of mitigating and aggravating circumstances." (Appellant's brief at p. 97.)
In support of his argument, the appellant relies on Guthrie v. State, in which we remanded the case for the trial court "to reconsider [the appellant's] sentence with a sufficient presentence report." 689 So.2d 935, 947 (Ala.Cr.App.1996), aff'd, 689 So.2d 951 (Ala.), cert. denied, 522 U.S. 848, 118 S.Ct. 135, 139 L.Ed.2d 84 (1997). However, his reliance on Guthrie is misplaced. In Guthrie, we were concerned because the appellant did not present any mitigating evidence during the sentencing hearings before the jury and the trial court; the appellant's personal and social history had been taken from an interview that was conducted at least five years before his sentencing hearing; the "Evaluation of Offender" section did not contain any information; and, although the report indicated that no psychological reports were available, it showed that the appellant had been incarcerated at Taylor Hardin Secure Mental Facility in 1988. Guthrie, 689 So.2d at 946-47. We explained our reason for reversing Guthrie's conviction as follows:
"This presentence report's cursory and incomplete treatment of [the appellant] troubles us, because it may have hamstrung the trial court's consideration of the full mosaic of [the appellant's] background and circumstances before determining the proper sentence. As such, this presentence report risked foiling the purpose of § 13A-5-47(b)."
Id. at 947.
Unlike the court in Guthrie, the trial court in this case had the opportunity to consider the "full mosaic of [the appellant's] background and circumstances" in sentencing him. The presentence report was dictated on August 27, 1998, one day after the jury recommended a sentence of death and three weeks before the sentencing hearing before the trial court. The "Evaluation of Offender" section contains commentary concerning his reputation within the community. Furthermore, the report includes information about the appellant's physical characteristics, family circumstances, marital status/history, employment history, educational background, arrest record, health, and financial status. Furthermore, during an earlier stage in the case, the probation and parole department had prepared a youthful offender investigation for the trial court's consideration in this case. Additionally, the defense presented proposed mitigating evidence. At the sentencing hearings before the jury and the trial court, through his own testimony and testimony from his father and two church acquaintances, the appellant presented evidence about his background and childhood. Finally, the trial court indicated in its sentencing order that it had considered statutory aggravating evidence and statutory and nonstatutory mitigating evidence in reaching its decision. Clearly, the trial court was not "hamstrung" in its consideration of the appellant's background and circumstances during the sentencing proceedings. Therefore, the appellant's argument is without merit.

XV.
The appellant's fifteenth argument is that the aggravating circumstance that he knowingly created a great risk of death to many people should not have applied in his case. See § 13A-5-49(3), Ala.Code 1975. Because he did not present this argument to the trial court, we review it for plain error. See Rule 45A, Ala. R.App. P.
First, the appellant contends that the application of this aggravating circumstance in this case is arbitrary and conflicts with prior law, specifically arguing that the four dead victims cannot be counted along with the survivors in determining the number of people who were present at the crime scene. He bases this conclusion *921 on an argument that, because those four deaths were the basis for the capital charge, counting them again as an aggravating factor would constitute impermissible double counting, in violation of double jeopardy principles. However, § 13A-5-50, Ala.Code 1975, provides, in pertinent part:
"The fact that a particular capital offense as defined in Section 13A-5-40(a) necessarily includes one or more aggravating circumstances as specified in Section 13A-5-49 shall not be construed to preclude the finding and consideration of that relevant circumstance or circumstances in determining sentence."
Thus, under § 13A-5-50, Ala.Code 1975, a jury may consider an element of capital murder as an aggravating circumstance if that element is specified as an aggravating circumstance in § 13A-5-49, Ala.Code 1975. Also, this court has held that the use of an element of capital murder as an aggravating circumstance does not punish a defendant twice for the same offense. See Burton v. State, 651 So.2d 641 (Ala.Cr. App.1993), aff'd, 651 So.2d 659 (Ala.1994), cert. denied, 514 U.S. 1115, 115 S.Ct. 1973, 131 L.Ed.2d 862 (1995).
"`This practice, known as "double counting" or "overlapping," has been upheld. Haney v. State, 603 So.2d 368 (Ala.Cr.App.1991), aff'd, 603 So.2d 412 (Ala.1992), cert. denied, 507 U.S. 925, 113 S.Ct. 1297, 122 L.Ed.2d 687 (1993); Kuenzel [v. State, 577 So.2d 474, 489 (Ala.Cr.App. 1990), aff'd, 577 So.2d 531 (Ala.), cert. denied, 502 U.S. 886, 112 S.Ct. 242, 116 L.Ed.2d 197 (1991)].
"`Section 13A-5-50, Code of Alabama 1975, states, in part, as follows:
"`"The fact that a particular capital offense as defined in section 13A-5-40(a) necessarily includes one or more aggravating circumstances as specified in section 13A-5-49 shall not be construed to preclude the finding and consideration of that relevant circumstance or circumstances in determining sentence."
"`Clearly, § 13A-5-50 provides that a jury may consider an element of capital murder as an aggravating circumstance if that element is listed in § 13A-5-49. Further, this court has repeatedly held that the use of an element of capital murder in such a way does not, as the appellant argues, punish a defendant twice for the same offense. Kuenzel, supra; see also Ex parte Kennedy, 472 So.2d 1106 (Ala.), cert. denied, 474 U.S. 975, 106 S.Ct. 340, 88 L.Ed.2d 325 (1985).
"`"A capital punishment scheme, under which the same felony may form the basis of an essential element of the crime and an aggravating circumstance for consideration by the jury in recommending a sentence, does not constitute a denial of the guarantee against double jeopardy."
"`Kuenzel, 577 So.2d at 488, quoting Fortenberry v. State, 545 So.2d 129, 142 (Ala.Cr.App.1988), aff'd, 545 So.2d 145 (Ala.1989), cert. denied, 495 U.S. 911, 110 S.Ct. 1937, 109 L.Ed.2d 300 (1990).'
"Burton, 651 So.2d at 657-58."
Hutcherson v. State, 677 So.2d 1174, 1201 (Ala.Cr.App.1994), rev'd on other grounds, 677 So.2d 1205 (Ala.1996). Accordingly, the appellant's double jeopardy argument is without merit. Thus, counting the four decedents, the appellant's conduct created a risk to seven people who were in one room and for one other person who was in another part of the residence. As we stated in Wesley v. State, "`[t]he number of victims who were murdered, shot, and shot at by the defendantsevenis undeniable proof that the defendant created a great risk of death to many persons.'" 575 So.2d 108, 121 (Ala.Cr.App.1989), rev'd on other grounds, 575 So.2d 127 (Ala.1990). Therefore, the application of the aggravating circumstance to this case is not arbitrary or inconsistent with prior law.
*922 The appellant next argues that the aggravating circumstance should not have been applied to his case because Acklin "fired the vast majority of the shots in the room[] and ... shot and killed at least three of the four people." (Appellant's brief at p. 99.) However, as set forth in Parts I and XXIV of this opinion, the appellant actively participated in the commission of the offense and was properly found to be responsible for his own actions and for Acklin's actions under accomplice liability principles. Therefore, his argument in this regard is without merit.
Finally, the appellant contends that "the term `many' remains ill-defined and vague." (Appellant's brief at p. 100.) We addressed a similar argument in Williams v. State, 710 So.2d 1276, 1341 (Ala.Cr.App.1996), aff'd, 710 So.2d 1350 (Ala.1997), cert. denied, 524 U.S. 929, 118 S.Ct. 2325, 141 L.Ed.2d 699 (1998), as follows:
"The appellant contends that, in its jury instructions in the penalty phase of the trial, the trial court erred by failing to define the phrase `knowingly created a great risk of death to many persons,' as that phrase applies to the aggravating circumstance set out in § 13A-5-49(3). Because the appellant did not raise this issue before the trial court, our review is under the plain error rule.
"The phrase at issue has not been defined by statute or by case law. `When a term is included in a statute relevant to a case, and that term is not defined by statute, whether it is necessary for the trial court to define the term for the jury hinges on the facts of the case. See Thornton v. State, 570 So.2d 762 (Ala.Cr.App.1990).' Ivery v. State, 686 So.2d 495 (Ala.Cr.App.1996). This principle `has added meaning when the challenged terms can be understood by the average juror in their common usage.' Thornton, 570 So.2d at 772. In this case, the intended meaning of the phrase at issue is clear on its face. This phrase is written in plain English and contains no terms of art or legal jargon. We fail to see any way in which a labored definition of this phrase would have clarified its meaning. Our conclusion is buttressed by the fact that, unlike the appellants in Ivery and Thornton, the appellant here has failed to present any conceivable confusion, based on the facts of this case, that may have resulted from the use of this phrase alone without definition. Moreover, the trial court's jury charge regarding this aggravating circumstance followed the pertinent pattern jury instruction in Proposed Pattern Jury Instructions for use in the Sentence Phase of Capital Cases Tried under Act No. 81-178. That pattern jury instruction provides no definition for the phrase at issue. `"`[W]e do not think we should hold that the trial judge plainly erred when he instructed the jury pursuant to a pattern jury instruction "recommended" by this Court, especially in the absence of an objection or request from the defendant.'" Kuenzel [v. State], 577 So.2d [474], 520, [(Ala.Cr.App.1990), aff'd, 577 So.2d 531 (Ala.1991), cert. denied, 502 U.S. 886, 112 S.Ct. 242, 116 L.Ed.2d 197 (1991)], quoting Ex parte Harrell, 470 So.2d 1309, 1315 [(Ala.1985)].' Williams v. State, 601 So.2d 1062 (Ala.Cr.App.1991), aff'd, 662 So.2d 929 (Ala.), cert. denied, 506 U.S. 957, 113 S.Ct. 417, 121 L.Ed.2d 340 (1992) (emphasis in original). We find no plain error here."
Therefore, we conclude that the term "many" and the remainder of § 13A-5-49(3), Ala.Code 1975, "define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." Kolender v. Lawson, 461 U.S. 352, 357, 103 S.Ct. 1855, 1858, 75 L.Ed.2d 903 (1983). Consequently, the appellant's vagueness argument is without merit.

XVI.
The appellant's sixteenth argument is that the trial court erred in not *923 granting his request to be treated as a youthful offender. Specifically, he contends that the trial court could not make an intelligent and informed decision as to whether to treat him as a youthful offender because it did not consider any evidence in making its decision. Because he did not present this issue to the trial court, we review it for plain error. See Rule 45A, Ala. R.App. P.
In ruling on a request to be treated as a youthful offender, a trial court must undertake an examination of the defendant sufficient to enable it to make an intelligent determination as to whether, in its discretion, the defendant is eligible for treatment as a youthful offender. See Burks v. State, 600 So.2d 374 (Ala.Cr.App. 1991). However, the court is not required to conduct a formal hearing in every case. See Burks, supra; Arrington v. State, 513 So.2d 40 (Ala.Cr.App.1987). Also, the trial court may consider the nature of the facts of the particular case in denying an application for treatment as a youthful offender. See Fields v. State, 644 So.2d 1322 (Ala.Cr.App.1994). Finally, a trial court has almost absolute discretion in deciding whether to grant or to deny a defendant treatment as a youthful offender, and we will not overturn such a decision absent an affirmative showing that the decision was arbitrary or was made without some investigation or examination of the defendant. See Burks, supra; Barnett v. State, 348 So.2d 512 (Ala.Cr.App.), cert. denied, 351 So.2d 571 (Ala.1977).
In this case, the trial court scheduled a hearing and gave the parties an opportunity to present evidence on the appellant's application for treatment as a youthful offender. At that time, defense counsel chose to rely on the information presented in the youthful offender investigation report rather than to present any evidence. The prosecutor also declined to present any evidence, but did remind the trial court about the seriousness of the offense and the appellant's prior criminal record. The trial court then denied the appellant's application, stating:
"As I have stated, I have reviewed the report of the probation and parole department, and due to the nature and gravity of the offenses in question charged by the indictment in this case, the court cannot grant your application to be arraigned as a youthful offender, and it is at this time denied."
(R. 3.) Clearly, the trial court considered the circumstances and nature of the case, as well as the charge itself, in denying the application. Accordingly, it did not abuse its discretion in denying the appellant's request to be treated as a youthful offender.

XVII.
The appellant's seventeenth argument is that the trial court erred in denying his motion for a change of venue due to allegedly prejudicial pretrial publicity. Specifically, he contends that the media coverage of the offense saturated the community and caused members of the jury to be prejudiced against him.
"`A trial court is in a better position than an appellate court to determine what effect, if any, pretrial publicity might have in a particular case. The trial court has the best opportunity to evaluate the effects of any pretrial publicity on the community as a whole and on the individual members of the jury venire. The trial court's ruling on a motion for a change of venue will be reversed only when there is a showing that the trial court has abused its discretion. Nelson v. State, 440 So.2d 1130 (Ala.Cr.App.1983).'
"Joiner v. State, 651 So.2d 1155, 1156 (Ala.Cr.App.1994)."
Clemons v. State, 720 So.2d 961, 977 (Ala. Cr.App.1996), aff'd, 720 So.2d 985 (Ala. 1998), cert. denied, 525 U.S. 1124, 119 S.Ct. 907, 142 L.Ed.2d 906 (1999). "The mere fact that publicity and media attention were widespread is not sufficient to warrant a change of venue. Rather, Ex *924 parte Grayson [, 479 So.2d 76 (Ala.1985),] held that the appellant must show that he suffered actual prejudice or that the community was saturated with prejudicial publicity." Slagle v. State, 606 So.2d 193, 195 (Ala.Cr.App.1992). "`Moreover, the passage of time cannot be ignored as a factor in bringing objectivity to trial.'" Whisenhant v. State, 555 So.2d 219, 224 (Ala.Cr. App.1988), aff'd, 555 So.2d 235 (Ala.1989), cert. denied, 496 U.S. 943, 110 S.Ct. 3230, 110 L.Ed.2d 676 (1990) (citations omitted) (quoting Dannelly v. State, 47 Ala.App. 363, 254 So.2d 434 (Ala.Cr.App.), cert. denied, 287 Ala. 729, 254 So.2d 443 (1971)).
"In connection with pretrial publicity, there are two situations which mandate a change of venue: 1) when the accused has demonstrated `actual prejudice' against him on the part of the jurors; 2) when there is `presumed prejudice' resulting from community saturation with such prejudicial pretrial publicity that no impartial jury can be selected. Sheppard v. Maxwell, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966); Rideau [v. Louisiana, 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963)]; Estes v. Texas, 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965); Ex parte Grayson, 479 So.2d 76, 80 (Ala.), cert. denied, 474 U.S. 865, 106 S.Ct. 189, 88 L.Ed.2d 157 (1985); Coleman v. Zant, 708 F.2d 541 (11th. Cir.1983)."
Hunt v. State, 642 So.2d 999, 1042-43 (Ala. Cr.App.1993), aff'd, 642 So.2d 1060 (Ala. 1994).
The appellant first contends that the allegedly prejudicial pretrial publicity resulted in "presumptive prejudice," thus depriving him of his right to be tried by an impartial jury. For a court to presume prejudice under this standard, the defendant must show: 1) that the pretrial publicity was prejudicial and inflammatory and 2) that the prejudicial pretrial publicity saturated the community where the trial was held. See Coleman v. Kemp, 778 F.2d 1487 (11th Cir.1985), cert. denied, 476 U.S. 1164, 106 S.Ct. 2289, 90 L.Ed.2d 730 (1986). A defendant bears an extremely heavy burden of proof under this standard.
"Hunt relies on the `presumed prejudice' standard announced in Rideau, and applied by the United States Supreme Court in Estes and Sheppard [v. Maxwell, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966)]. This standard was defined by the Eleventh Federal Circuit Court of Appeals in Coleman v. Kemp, 778 F.2d 1487 (11th Cir.1985), cert. denied, 476 U.S. 1164, 106 S.Ct. 2289, 90 L.Ed.2d 730 (1986). The court stated: `Prejudice is presumed from pretrial publicity when pretrial publicity is sufficiently prejudicial and inflammatory and the prejudicial pretrial publicity saturated the community where the trials were held.' 778 F.2d at 1490 (emphasis added [in Hunt]). See also Holladay v. State, 549 So.2d 122, 125 (Ala. Cr.App.1988), affirmed, 549 So.2d 135 (Ala.), cert. denied, 493 U.S. 1012, 110 S.Ct. 575, 107 L.Ed.2d 569 (1989).
"In determining whether the `presumed prejudice' standard exists the trial court should look at `the totality of the surrounding facts.' Patton v. Yount, 467 U.S. 1025, 104 S.Ct. 2885, 81 L.Ed.2d 847 (1984); Murphy v. Florida, 421 U.S. 794, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975); Irvin v. Dowd, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961). The presumptive prejudice standard is `rarely' applicable, and is reserved for only `extreme situations.' Coleman v. Kemp, 778 F.2d at 1537. `In fact, our research has uncovered only a very few... cases in which relief was granted on the basis of presumed prejudice.' Coleman v. Kemp, 778 F.2d at 1490.
"Hunt had the burden of showing that `prejudicial pretrial publicity' saturated the community. Sheppard, supra. `[T]he burden placed upon the petitioner to show that pretrial publicity deprived him of his right to a fair trial before an impartial jury is an extremely heavy one.' Coleman v. Kemp, 778 F.2d at 1537. `Prejudicial' publicity usually *925 must consist of much more than stating the charge, and of reportage of the pretrial and trial processes. `Publicity' and `prejudice' are not the same thing. Excess publicity does not automatically or necessarily mean that the publicity was prejudicial.
". . . .
"... In order to meet the burden of showing the necessity for a change of venue due to pretrial publicity on the grounds of community saturation, `the appellant must show more than the fact "that a case generates even widespread publicity."' Oryang v. State, 642 So.2d 979, 983 (Ala.Cr.App.1993), quoting, Thompson v. State, 581 So.2d 1216, 1233 (Ala.Cr.App.1991), cert. denied, 502 U.S. 1030, 112 S.Ct. 868, 116 L.Ed.2d 774 (1992).
"`"Newspaper articles alone would not necessitate a change in venue unless it was shown that the articles so affected the general citizenry through the insertion of such sensational, accusational or denunciatory statements, that a fair and impartial trial was impossible. Patton v. State, 246 Ala. 639, 21 So.2d 844 [1945]."'
"Thompson, 581 So.2d at 1233, quoting McLaren v. State, 353 So.2d 24, 31 (Ala. Cr.App.), cert. denied, 353 So.2d 35 (Ala. 1977).
"A review of the media coverage contained in the record on appeal demonstrates that the majority of print media coverage was reasonably factual and more or less objective. We find that the reportage by the news media did not result in the community being so `pervasively saturated' with prejudicial publicity so as to make the court proceedings nothing more than a `hollow formality.' Rideau, supra."
Hunt, 642 So.2d at 1043-44. "To justify a presumption of prejudice under this standard, the publicity must be both extensive and sensational in nature. If the media coverage is factual as opposed to inflammatory or sensational, this undermines any claim for a presumption of prejudice." United States v. Angiulo, 897 F.2d 1169, 1181 (1st Cir.), cert. denied, 498 U.S. 845, 111 S.Ct. 130, 112 L.Ed.2d 98 (1990).
After examining the media materials the appellant presented to the trial court, we conclude that those materials did not contain prejudicial information. Rather, most of the reports were factual and relatively objective rather than accusatory, inflammatory, or sensational. Further, the appellant did not show that the media coverage inflamed or saturated the community so that there was an emotional tide against him. Therefore, he has not shown that the pretrial publicity about his case was so inherently or presumptively prejudicial as to constitute one of those "extreme situations" that warrant a presumption of prejudice caused by pretrial publicity.
The appellant also appears to argue that members of the jury were actually prejudiced against him.
"The `actual prejudice' standard is defined as follows:
"`To find the existence of actual prejudice, two basic prerequisites must be satisfied. First, it must be shown that one or more jurors who decided the case entertained an opinion, before hearing the evidence adduced at trial, that the defendant was guilty. Irvin v. Dowd, 366 U.S. [717,] 727, 81 S.Ct. [1639,] 1645, [6 L.Ed.2d 751, 758-59 (1961)]. Second, these jurors, it must be determined, could not have laid aside these preformed opinions and "render[ed] a verdict based on the evidence presented in court." Irvin v. Dowd, 366 U.S. at 723, 81 S.Ct. at 1643 [6 L.Ed.2d at 756].'
"Coleman v. Zant, 708 F.2d at 544."
Hunt, 642 So.2d at 1043.
"Furthermore, in order for a defendant to show prejudice, the `"proper manner for ascertaining whether adverse publicity *926 may have biased the prospective jurors is through the voir dire examination." Anderson v. State, 362 So.2d 1296, 1299 (Ala.Crim.App.1978).' Ex parte Grayson, 479 So.2d 76, 80 (Ala. 1985), cert. denied, 474 U.S. 865, 106 S.Ct. 189, 88 L.Ed.2d 157 (1985)."
Oryang v. State, 642 So.2d 979, 983 (Ala. Cr.App.1993).
The appellant has not satisfied his burden of showing that any of the jurors who decided his case were actually prejudiced against him due to pretrial publicity. The trial court and the attorneys extensively questioned the veniremembers about their knowledge about the case and any effect pretrial publicity may have had on their ability to be fair and impartial. Many of the veniremembers were familiar with the facts of, and the circumstances surrounding, this offense. However, only one indicated that he was biased against the appellant based on information he obtained from the media, and the trial court excused that veniremember for cause. There was no indication that any of the remaining veniremembers were biased against the appellant because of the pretrial publicity. Therefore, the appellant has not shown that the jurors who decided his case were actually prejudiced against him.
For these reasons, the appellant did not show that the veniremembers were either presumptively or actually prejudiced against him. Therefore, the trial court did not abuse its discretion in denying the appellant's motion for a change of venue.

XVIII.
The appellant's eighteenth argument is that the trial court erred when it denied him discovery that was allegedly critical to his defense. Specifically, he contends that the trial court should have granted his motion to depose the State's expert witnesses before trial so he could adequately prepare his defense. Although it denied the appellant's motion to depose the State's expert witnesses, the trial court did order the State to identify the expert witnesses it intended to call at trial and to produce the curriculum vitae, certificates, qualifying documents, and other background documents necessary for the defense to assess the qualifications of the experts. (C.R.125.)
"In Alabama, there is no constitutional right to discovery in a criminal case. Rule 16, Alabama Rules of Criminal Procedure, affords an accused, a limited right of discovery in a pending criminal action. The extent of discovery is within the discretion of the trial court."
Ex parte Land, 775 So.2d 840 (Ala.Cr. App.1998), overruled on other grounds, 775 So.2d 847 (Ala.1999). See also Pace v. State, 714 So.2d 320 (Ala.Cr.App.1996), rev'd in part, 714 So.2d 332 (Ala.1997), cert. denied, 523 U.S. 1051, 118 S.Ct. 1372, 140 L.Ed.2d 520 (1998); Bass v. State, 417 So.2d 582 (Ala.Cr.App.), writ denied, 417 So.2d 588 (Ala.1982). Rule 16, Ala. R.Crim. P., does not specifically provide that every criminal defendant is entitled to depose the State's expert witnesses. In this case, the appellant has not shown that deposing the State's expert witnesses was critical to his defense. During the discovery process, he received documentary evidence from which he could prepare to impeach the credibility, training, and expertise of, as well as the conclusions reached by, the State's expert witnesses. Furthermore, the experts did not testify about highly technical or "arcane" subject matter as the appellant alleges. Therefore, the appellant has not shown that the trial court abused its discretion in denying his request. See Maples v. State, 758 So.2d 1 (Ala.Cr.App.1999).

XIX.
The appellant's nineteenth argument is that the trial court improperly refused to control pretrial publicity. As a result, he contends that pretrial publicity contaminated almost the entire venire. Initially, we note that the trial court entered an order restraining the prosecution, the defense, law enforcement officials, and *927 witnesses from making any oral or written extrajudicial statements about the case. (C.R.122-23.) Also, the State suggested, and the trial court agreed, that the parties could avoid some publicity by filing any future motions under seal. (R. 50-51.) Finally, as discussed in part XVII of this opinion, the appellant did not show that pretrial publicity saturated the community to such an extent that prejudice should be presumed, and he did not show that the venire was actually prejudiced against him. Therefore, his argument is without merit.

XX.
The appellant's twentieth argument is that the trial court improperly excluded veniremembers who expressed reservations about the death penalty. Specifically, he contends that the trial court improperly excluded veniremembers A.C., C.C., K.K., T.M., S.T., H.U., D.N., K.S., H.R., T.H., M.S., C.B., F.C., M.M., and R.R. on the basis of their beliefs about the death penalty. Because the appellant did not object at trial to the dismissal of these veniremembers, we must review this claim for plain error. Rule 45A, Ala. R.App. P.
Regarding challenges for cause in capital cases, § 12-16-152, Ala.Code 1975, provides:
"On the trial for any offense which may be punished capitally or by imprisonment in the penitentiary, it is a good cause of challenge by the state that the person would refuse to impose the death penalty regardless of the evidence produced or has a fixed opinion against penitentiary punishment or thinks that a conviction should not be had on circumstantial evidence, which cause of challenge may be proved by the oath of the person or by other evidence."
See also Hutcherson v. State, 677 So.2d 1174 (Ala.Cr.App.1994), rev'd on other grounds, 677 So.2d 1205 (Ala.1996); Dobyne v. State, 672 So.2d 1319 (Ala.Cr.App. 1994), aff'd, 672 So.2d 1354 (Ala.1995), cert. denied, 517 U.S. 1169, 116 S.Ct. 1571, 134 L.Ed.2d 670 (1996). Initially, we note that the appellant moved to excuse for cause all veniremembers who indicated that they would automatically vote to impose the death penalty upon conviction for a capital offense, and further note that the trial court excused all such veniremembers. (R. 234, 236, 431-32.) Further, veniremembers A.C., C.C., K.K., T.M., S.T., H.U., K.S., H.R., T.H., M.S., C.B., F.C., M.M., and R.R. all stated without reservation that they would automatically vote against imposing the death penalty. (R. 209-33, 421-30.) Therefore, pursuant to § 12-16-152, Ala.Code 1975, the trial court properly excused them for cause on that ground.
Also, during voir dire examination, veniremember D.N. equivocated about whether she would automatically vote against imposing the death penalty. She initially stated that she would automatically vote against imposing the death penalty, but later stated that she would not automatically vote against imposing the death penalty. However, she also specifically asked that she be excused because she had hearing problems. Additionally, the trial court noted that D.N. was having a difficult time answering voir dire questions. Afterward, the trial court excused D.N. for cause. (R. 225.)
"`"The proper standard for determining whether a prospective juror may be excluded for cause because of his or her views on capital punishment is `whether the juror's views would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath."' Wainwright v. Witt, 469 U.S. 412, 424, 105 S.Ct. 844, 852, 83 L.Ed.2d 841 (1985); Gray v. Mississippi, 481 U.S. 648 [at 657-58], 107 S.Ct. 2045, 2051, 95 L.Ed.2d 622 (1987). `The crucial inquiry is whether the venireman could follow the court's instructions and obey his oath, notwithstanding his views on capital punishment.' Dutton v. Brown, 812 *928 F.2d 593, 595 (10th Cir.), cert. denied, Dutton v. Maynard, 484 U.S. 836, 108 S.Ct. 116, 98 L.Ed.2d 74 (1987). A juror's bias need not be proved with `unmistakable clarity' because `juror bias cannot be reduced to question and answer sessions which obtain results in the manner of a catechism.' Id.

"`"A trial judge's finding on whether or not a particular juror is biased `is based upon determination of demeanor and credibility that are peculiarly within a trial judge's province.' Witt, 469 U.S. at 428, 105 S.Ct. at 854. That finding must be accorded proper deference on appeal. Id. `A trial court's rulings on challenges for cause based on bias [are] entitled to great weight and will not be disturbed on appeal unless clearly shown to be an abuse of discretion.' Nobis v. State, 401 So.2d 191, 198 (Ala.Cr.App.), cert. denied, Ex parte Nobis, 401 So.2d 204 (Ala.1981)."
"`Martin v. State, 548 So.2d 488, 490-91 (Ala.Cr.App.1988), affirmed, 548 So.2d 496 (Ala.1989), cert. denied, 493 U.S. 970, 110 S.Ct. 419, 107 L.Ed.2d 383 (1989). "[A] blanket declaration of support of or opposition to the death penalty is not necessary for a trial judges to disqualify a juror." Ex parte Whisenhant, 555 So.2d 235, 241 (Ala.1989), cert. denied, 496 U.S. 943, 110 S.Ct. 3230, 110 L.Ed.2d 676 (1990).'"
Dallas v. State, 711 So.2d 1101, 1107 (Ala. Cr.App.1997), aff'd, 711 So.2d 1114 (Ala.), cert. denied, 525 U.S. 860, 119 S.Ct. 145, 142 L.Ed.2d 118 (1998) (quoting Taylor v. State, 666 So.2d 36, 47 (Ala.Cr.App.1994), aff'd, 666 So.2d 73 (Ala.1995), cert. denied, 516 U.S. 1120, 116 S.Ct. 928, 133 L.Ed.2d 856 (1996)). In light of D.N.'s initial representations that she would automatically vote against the imposition of the death penalty and her hearing problems, it appears that the trial court was not sure that she was being candid or that she understood the question when she said she could vote to impose the death penalty. See Wainwright v. Witt, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985); Dallas, supra. Therefore, the trial court did not abuse its discretion in excusing veniremember D.N. for cause.

XXI.
The appellant's twenty-first argument is that the trial court erroneously admitted photographs that served only to inflame the passions of the jury. He contends that the photographs "were likely to arouse the jury's passions against [him] but do little else, for they were not necessary to the state's case. The crime scene and autopsy were described in detail by the medical examiner, police officers, and the pathologist." (Appellant's brief at p. 110-11.)
"`Photographic evidence is admissible in a criminal prosecution if it tends to prove or disprove some disputed or material issue, to illustrate some relevant fact or evidence, or to corroborate or dispute other evidence in the case. Photographs that tend to shed light on, to strengthen, or to illustrate other testimony presented may be admitted into evidence.... Finally[,] photographic evidence, if relevant, is admissible even if it has a tendency to inflame the minds of the jurors.'"
Gaddy v. State, 698 So.2d 1100, 1148 (Ala. Cr.App.1995), aff'd, 698 So.2d 1150 (Ala.), cert. denied, 522 U.S. 1032, 118 S.Ct. 634, 139 L.Ed.2d 613 (1997) (quoting Ex parte Siebert, 555 So.2d 780, 783-84 (Ala.1989), cert. denied, 497 U.S. 1032, 110 S.Ct. 3297, 111 L.Ed.2d 806 (1990)).
"`[P]hotographs depicting the character and location of wounds on a deceased's body are admissible even though they are cumulative and are based on undisputed matters. Magwood [v. State], 494 So.2d [124, 141 (Ala.Cr.App.1985), affirmed, 494 So.2d 154 (Ala.), cert. denied, 479 U.S. 995, 107 S.Ct. 599, 93 L.Ed.2d 599 (1986)]. The fact that a photograph is grue-some *929 is not grounds to exclude it as long as the photograph sheds light on issues being tried. Id. Also, a photograph may be gruesome and ghastly, but this is not a reason to exclude it as long as the photograph is relevant to the proceedings, even if it tends to inflame the jury. Id.'
"Ex parte Bankhead, 585 So.2d 112 (Ala. 1991). Accord, Ex parte Siebert, 555 So.2d 780, 783-84 (Ala.1989), cert. denied, 497 U.S. 1032, 110 S.Ct. 3297, 111 L.Ed.2d 806 (1990); McElroy's at § 207.01(2)."
Parker v. State, 587 So.2d 1072, 1092-93 (Ala.Cr.App.1991), aff'd, 610 So.2d 1181 (Ala.1992), cert. denied, 509 U.S. 929, 113 S.Ct. 3053, 125 L.Ed.2d 737 (1993). Photographs that depict the crime scene are relevant and therefore are admissible. Aultman v. State, 621 So.2d 353 (Ala.Cr. App.1992), cert. denied, 510 U.S. 954, 114 S.Ct. 407, 126 L.Ed.2d 354 (1993); Ex parte Siebert, 555 So.2d 780, 783-84 (Ala. 1989), cert. denied, 497 U.S. 1032, 110 S.Ct. 3297, 111 L.Ed.2d 806 (1990); Hill v. State, 516 So.2d 876 (Ala.Cr.App.1987). Also, autopsy photographs, although gruesome, are admissible to show the extent of a victim's injuries. See Dabbs v. State, 518 So.2d 825 (Ala.Cr.App.1987).
"With regard to photographs of the victim taken after he had been shot, even though they are cumulative and pertain to undisputed matters, generally photographs that depict the external wounds on the body of the victim are admissible. Bankhead, 585 So.2d at 109. As we held in Jenkins v. State, 627 So.2d 1034 (Ala.Crim.App.1992), aff'd, 627 So.2d 1054 (Ala.1993), `[t]he state [has] the burden of proving that the victim [is] dead, and [photographs are] direct evidence on that point. Perpetrators of crimes that result in gruesome scenes have reason to expect that photographs of those gruesome scenes will be taken and admitted into evidence.'"
Sockwell v. State, 675 So.2d 4, 21 (Ala.Cr. App.1993), aff'd, 675 So.2d 38 (Ala.1995), cert. denied, 519 U.S. 838, 117 S.Ct. 115, 136 L.Ed.2d 67 (1996). "There is irony in a convicted murderer's contending on appeal that pictures of the corpse of his victim might have inflamed the jury. That risk `comes with the territory.'" Grice v. State, 527 So.2d 784, 787 (Ala.Cr.App. 1988). Finally,
"`"[p]hotographic evidence, if relevant, is admissible even if it has a tendency to inflame the minds of the jurors." Ex parte Siebert, 555 So.2d 780, 784 (Ala.1989), cert. denied, 497 U.S. 1032, 110 S.Ct. 3297, 111 L.Ed.2d 806 (1990). See generally C. Gamble, McElroy's Alabama Evidence, § 207.01(2) (4th ed.1991). "The photographs of the victim were properly admitted into evidence. Photographic exhibits are admissible even though they may be cumulative, ... demonstrative of undisputed facts, ... or gruesome...." Williams v. State, 506 So.2d 368, 371 (Ala.Cr.App.1986), cert. denied, 506 So.2d 372 (Ala.1987).'
"DeBruce v. State, 651 So.2d 599, 607 (Ala.Cr.App.1993). See also Ex parte Bankhead, 585 So.2d 112 (Ala.1991)."
Hutcherson v. State, 677 So.2d 1174, 1200 (Ala.Cr.App.1994), rev'd on other grounds, 677 So.2d 1205 (Ala.1996). See also Giles v. State, 632 So.2d 568 (Ala.Cr.App.1992), aff'd, 632 So.2d 577 (Ala.1993), cert. denied, 512 U.S. 1213, 114 S.Ct. 2694, 129 L.Ed.2d 825 (1994); Haney v. State, 603 So.2d 368 (Ala.Cr.App.1991), aff'd, 603 So.2d 412 (Ala.1992), cert. denied, 507 U.S. 925, 113 S.Ct. 1297, 122 L.Ed.2d 687 (1993). After reviewing the photographs that were admitted into evidence in this case, we conclude that they were relevant to show the crime scene and the injuries each victim suffered. Therefore, the trial court did not err in admitting them into evidence.

XXII.
The appellant's twenty-second argument is that a strong victims' presence in the courtroom deprived him *930 of a fair trial and an accurate sentence determination. First, he contends that "the overwhelming presence of victims' family members in the courtroom denied [him] a fair trial free from passion and prejudice and injected irrelevant and plainly inflammatory considerations into his trial." (Appellant's brief at p. 111.) Second, he asserts that the trial court improperly allowed one of the victims, Michelle Hayden, to remain in the courtroom throughout the trial and to testify as the last witness for the State. Because the appellant did not present these interrelated claims to the trial court, we review them for plain error. See Rule 45A, Ala. R.App. P.
Generally, a trial court may exclude witnesses from the courtroom. See Rule 9.3(a), Ala. R.Crim. P. However, with regard to the right of victims to be present in the courtroom, the Code provides as follows:
"(a) The Legislature hereby finds and determines that it is essential to the fair and impartial administration of justice that a victim of a criminal offense be afforded a reasonable opportunity to attend any trial or hearing or any portion thereof conducted by any court which in any way pertains to such offense.
"(b) Further, the Legislature hereby finds and determines that it is essential to the fair and impartial administration of justice that a victim of a criminal offense not be excluded from any hearing or trial or any portion thereof conducted by any court which in any way pertains to such offense, merely because the victim has been or may be subpoenaed to testify at such hearing or trial or because of any arbitrary or invidious reason."
§ 15-14-51, Ala.Code 1975.
"The victim of a criminal offense shall be entitled to be present in any court exercising any jurisdiction over such offense and therein to be seated at the counsel table of any prosecutor prosecuting such offense...."
§ 15-14-53, Ala.Code 1975.
"A victim of a criminal offense shall not be excluded from court or counsel table during the trial or hearing or any portion thereof conducted by any court which in any way pertains to such offense...."
§ 15-14-54, Ala.Code 1975.
"A victim of a criminal offense shall be exempt from the operation of rule of court, regulation, or statute or other law requiring the separation or exclusion of witnesses from court in criminal trials or hearings."
§ 15-14-55, Ala.Code 1975. Also, with regard to the right of family members of victims to be present in the courtroom, § 15-14-56(a), Ala.Code 1975, provides:
"Whenever a victim is unable to attend such trial or hearing or any portion thereof by reason of death ... the victim's family may select a representative who shall be entitled to exercise any right granted to the victim, pursuant to the provisions of this article."
Finally, Rule 615, Ala. R. Evid., provides:
"At the request of a party the court may order witnesses excluded so that they cannot hear the testimony of other witnesses and it may make the order of its own motion. This rule does not authorize exclusion of ... a victim of a criminal offense or the representative of a victim who is unable to attend...."
Based on these statutes and rules, the trial court did not err in allowing Michelle Hayden to remain in the courtroom throughout the trial, even though she testified as the final witness for the State. The trial court also had the authority to allow the representatives of the slain victims to remain in the courtroom throughout the proceedings. From the record before us, we cannot determine how many family members were present in the courtroom. Furthermore, there is no indication that *931 their presence prejudiced the appellant.[1] Consequently, we do not find any plain error in this regard.

XXIII.
The appellant's twenty-third argument is that the manner of execution inflicted by the State of Alabama constitutes cruel and unusual punishment. However, numerous cases have held that the death penalty is not per se cruel and unusual punishment and that electrocution is not a cruel and unusual method of capital punishment. See Williams v. State, 627 So.2d 985 (Ala.Cr.App.1991), aff'd, 627 So.2d 999 (Ala.1993), cert. denied, 511 U.S. 1012, 114 S.Ct. 1387, 128 L.Ed.2d 61 (1994); Proffitt v. Florida, 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976); Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972); Zant v. Stephens, 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983); Boykin v. State, 281 Ala. 659, 207 So.2d 412 (1968), rev'd on other grounds, 395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969).

XXIV.
The appellant's twenty-fourth argument is that the State did not present sufficient evidence to support his conviction for capital murder. Specifically, he argues that the State did not prove that he had the requisite intent to kill two or more people and did not show that he actually killed two or more people. He further argues that, although the evidence showed that Acklin killed several people, the State did not present sufficient evidence to show that he should be found guilty as an accomplice.
"`In determining the sufficiency of the evidence to sustain the conviction, this Court must accept as true the evidence introduced by the State, accord the State all legitimate inferences there-from, and consider the evidence in the light most favorable to the prosecution.' Faircloth v. State, 471 So.2d 485, 489 (Ala.Cr.App.1984), affirmed, Ex parte Faircloth, [471] So.2d 493 (Ala.1985).
"`. . . .
"`"The role of appellate courts is not to say what the facts are. Our role,... is to judge whether the evidence is legally sufficient to allow submission of an issue for decision to the jury." Ex parte Bankston, 358 So.2d 1040, 1042 (Ala.1978). An appellate court may interfere with the jury's verdict only where it reaches "a clear conclusion that the finding and judgment are wrong." Kelly v. State, 273 Ala. 240, 244, 139 So.2d 326 (1962). "The rule is clearly established in this State that a verdict of conviction should not be set aside on the ground of the insufficiency of the evidence to sustain the verdict, unless, after allowing all reasonable presumptions of its correctness, the preponderance of the evidence against the verdict is so decided as to clearly convince the court that it was wrong and unjust." Bridges v. State, 284 Ala. 412, 420, 225 So.2d 821 (1969).... A verdict on conflicting evidence is conclusive on appeal. Roberson v. State, 162 Ala. 30, 50 So. 345 (1909). "[W]here there is ample evidence offered by the state to support a verdict, it should not be overturned even though the evidence offered by the defendant is in sharp conflict therewith and presents a substantial defense." Fuller v. State, 269 Ala. 312, 333, 113 So.2d 153 (1959), cert. denied, Fuller v. Alabama, 361 U.S. 936, 80 S.Ct. 380, 4 L.Ed.2d 358 (1960).' Granger[ v. State], 473 So.2d [1137] at 1139 [(Ala.Cr.App.1985)].

*932 "... `Circumstantial evidence alone is enough to support a guilty verdict of the most heinous crime, provided the jury believes beyond a reasonable doubt that the accused is guilty.' White v. State, 294 Ala. 265, 272, 314 So.2d 857, cert. denied, 423 U.S. 951, 96 S.Ct. 373, 46 L.Ed.2d 288 (1975). `Circumstantial evidence is in no wise considered inferior evidence and is entitled to the same weight as direct evidence provided it points to the guilt of the accused.' Cochran v. State, 500 So.2d 1161, 1177 (Ala.Cr.App.1984), affirmed in pertinent part, reversed in part on other grounds, Ex parte Cochran, 500 So.2d 1179 (Ala. 1985)."
White v. State, 546 So.2d 1014, 1017 (Ala. Cr.App.1989).
The appellant was charged with committing "[m]urder wherein two or more persons are murdered by the defendant by one act or pursuant to one scheme or course of conduct." See § 13A-5-40(10), Ala.Code 1975. At trial, the State proceeded under an accomplice liability theory. Alabama's accomplice liability statute provides:
"A person is legally accountable for the behavior of another constituting a criminal offense if, with the intent to promote or assist the commission of the offense:
"(1) He procures, induces or causes such other person to commit the offense; or
"(2) He aids or abets such other person in committing the offense...."
§ 13A-2-23, Ala.Code 1975.
"The words `aid and abet' encompass all assistance by acts, words of encouragement, or support, or presence, actual or constructive, to render assistance should it become necessary. Wright [v. State, 494 So.2d 936 (Ala.Cr.App.1986)]; Sanders v. State, 423 So.2d 348 (Ala.Cr. App.1982). Actual participation in the crime need not be proved by positive testimony to convict someone of aiding and abetting. `The jury is to determine whether the appellant's participation exists and the extent of it from the conduct of the parties and all the testimony presented.' Walls v. State, 378 So.2d 1186, 1191 (Ala.Cr.App.1979), cert. denied, Ex parte Walls, 378 So.2d 1193 (Ala.1980). Such facts as the defendant's presence in connection with his companionship, and his conduct at, before and after the commission of the act, are potent circumstances from which participation may be inferred."
Henry v. State, 555 So.2d 768, 769 (Ala.Cr. App.1989).
"Any word or act contributing to the commission of a felony, intended and calculated to incite or encourage its accomplishment, whether or not the one so contributing is present, brings the accused within the statute that makes any person concerned in the commission of a felony, directly or indirectly, a principal. No particular acts are necessary to make one an aider and abettor...."
Scott v. State, 374 So.2d 316, 318-19 (Ala. 1979) (citations omitted). And, "`[w]here the evidence is conflicting as to the defendant's connection as an accomplice or co-conspirator, a jury question is presented.'" Henry, 555 So.2d at 770. However,
"[u]nder the accomplice liability doctrine, a nontriggerman accomplice may be convicted of the capital offense of double murder only if he had the particularized intent that both victims be killed. In addition, `[t]o affirm a finding of a "particularized intent to kill" the jury must be properly charged on the intent to kill issue.'"
Tomlin v. State, 591 So.2d 550, 557 (Ala. Cr.App.1991) (citations omitted). "`Intent,... being a state or condition of the mind, is rarely, if ever, susceptible of direct or positive proof, and must usually be inferred from the facts testified to by witnesses and the circumstances as developed by the evidence.'" French v. State, 687 So.2d 202, 204 (Ala.Cr.App.1995), rev'd on other grounds, 687 So.2d 205 (Ala.1996) *933 (quoting McCord v. State, 501 So.2d 520, 528-29 (Ala.Cr.App.1986)).
"`The question of intent is hardly ever capable of direct proof. Such questions are normally questions for the jury. McMurphy v. State, 455 So.2d 924 (Ala. Crim.App.1984); Craig v. State, 410 So.2d 449 (Ala.Crim.App.1981), cert. denied, 410 So.2d 449 (Ala.1982).' Loper v. State, 469 So.2d 707, 710 (Ala.Cr.App. 1985). `Where one assaults another by the use of a deadly weapon, the law will infer from that fact that he designed to accomplish the probable and natural results of his act, in the absence of proof to the contrary.' Snipes v. State, 364 So.2d 424, 426 (Ala.Cr.App.1978)."
Oryang v. State, 642 So.2d 989, 994 (Ala. Cr.App.1994). Also, "[i]ntent may be inferred from the use of a deadly weapon, the character of the assault, or other attendant circumstances." DeRamus v. State, 565 So.2d 1167, 1171 (Ala.Cr.App. 1990) (citing Garrison v. State, 521 So.2d 997 (Ala.Cr.App.1986)). Finally, § 13A-1-2(11), Ala.Code 1975, provides that a firearm is a deadly weapon.
As previously stated in Part V of this opinion, the trial court properly instructed the jury on the capital offense, including the particularized intent to kill necessary to sustain a capital murder conviction. The trial court also instructed the jury on accomplice liability as follows:
"[A] person is legally accountable for the behavior of another person constituting a crime if with an intent to promote or assist in the commission of the crime he either procures, induces or causes such other person to commit the crime, or aids or abets such other person in committing the crime. Now, the words `aid' or `abet' mean all assistance rendered by acts or words of encouragement or support or presence, whether actual or constructive, and to render assistance should it become necessary. Mere presence at the scene of a crime does not make a person an accessory. A defendant who does not personally commit the act of killing which constitutes the murder is not guilty of a capital offense unless that defendant is legally accountable for the murder because of complicity in the murder itself under the provisions of the complicity statute that I have just explained, in addition to being guilty of the other elements of the capital offense.
"Therefore, if you find that a murder of the intentional type of two or more of the following people: Charles L. Hemphill, Michael A. Beaudette, Johnny Couch and Brian Carter was committed by some person or persons other than the defendant, the defendant is guilty of that intentional type of murder if, but only if, you find beyond a reasonable doubt either that the defendant intentionally had a particularized intent in procuring, inducing or causing the other person or persons to commit the crime, or that the defendant intentionally aided or abetted the other person or persons with a particularized intent in the commission of the murder."
(R. 1630-31.)
The evidence against the appellant was overwhelming. From that evidence, the jury could have reasonably concluded that the appellant was an accomplice to Acklin. It also could have reasonably concluded that he had the particularized intent that two or more people be killed. Therefore, the State presented sufficient evidence to support the appellant's capital murder conviction.

XXV.
The appellant's twenty-fifth argument is that the cumulative effect of the aforementioned errors entitles him to a new trial and a new sentence determination. However, we have reviewed the record and have not found any errors that were prejudicial to the appellant. Consequently, the appellant's argument is without merit.

*934 XXVI.
Pursuant to § 13A-5-53, Ala.Code 1975, we must address the propriety of the appellant's conviction and sentence of death. The appellant was indicted and convicted of capital murder because he killed two or more people by one act or pursuant to one scheme or course of conduct. See § 135-40(a)(10), Ala.Code 1975.
The record does not reflect that the sentence of death was imposed as a result of the influence of passion, prejudice, or any other arbitrary factor. See § 13A-5-53(b)(1), Ala.Code 1975.
The trial court found that the aggravating circumstances outweighed the mitigating circumstances. The trial court found that the State proved that two aggravating circumstances existed: 1) the actual offense was committed when the defendant knowingly created a great risk of death to many persons, § 13A-5-49(3), Ala.Code 1975, and 2) the capital offense was especially heinous, atrocious, or cruel when compared to other capital offenses, § 13A-5-49(8), Ala.Code 1975. The trial court found that two statutory mitigating circumstances existed: 1) the appellant had no significant history of prior criminal activity, § 13A-5-51(1), Ala.Code 1975, and 2) the age of the defendant at the time of the offense, § 13A-5-51(7), Ala.Code 1975. The trial court also found the following non-statutory mitigating circumstances existed: 1) the defendant does not have a significant prior history of assaultive or violent conduct and 2) the fact that two witnesses from the defendant's church testified that he was a person of good character and participated in church activities. The sentencing order shows that the trial court weighed the aggravating and mitigating circumstances and correctly sentenced the appellant to death. Its decision is supported by the record, and we agree with its findings.
Section 13A-5-53(b)(2), Ala.Code 1975, requires us to weigh the aggravating and mitigating circumstances independently to determine the propriety of the appellant's death sentence. After independently weighing the aggravating and mitigating circumstances, we find that the death sentence is appropriate.
As required by § 13A-5-53(b)(3), Ala.Code 1975, we must determine whether the appellant's sentence was disproportionate or excessive when compared to the penalties imposed in similar cases. The appellant killed four people pursuant to one scheme or course of conduct. Similar crimes are being punished by death throughout this state. See Taylor v. State, 666 So.2d 36 (Ala.Cr.App.), opinion extended after remand, 666 So.2d 71 (Ala.Cr.App. 1994), aff'd, 666 So.2d 73 (Ala.1995), cert. denied, 516 U.S. 1120, 116 S.Ct. 928, 133 L.Ed.2d 856 (1996); Siebert v. State, 555 So.2d 772 (Ala.Cr.App.), aff'd, 555 So.2d 780 (Ala.1989), cert. denied, 497 U.S. 1032, 110 S.Ct. 3297, 111 L.Ed.2d 806 (1990); Holladay v. State, 549 So.2d 122 (Ala.Cr. App.1988), aff'd, 549 So.2d 135 (Ala.), cert. denied, 493 U.S. 1012, 110 S.Ct. 575, 107 L.Ed.2d 569 (1989); Peoples v. State, 510 So.2d 554 (Ala.Cr.App.1986), aff'd, 510 So.2d 574 (Ala.), cert. denied, 484 U.S. 933, 108 S.Ct. 307, 98 L.Ed.2d 266 (1987). Therefore, we find that the sentence of death was neither disproportionate nor excessive.
Finally, we have searched the entire record for any error that may have adversely affected the appellant's substantial rights, and we have not found any. Rule 45A, Ala. R.App. P. Furthermore, the appellant does not appear to challenge his attempted murder convictions or sentences. Accordingly, we affirm the appellant's convictions and sentences.
AFFIRMED.
LONG, P.J., and McMILLAN, COBB, and FRY, JJ., concur.
NOTES
[1] The appellant contends that, at one point in the trial, the presence of the victims' family members was so strong that his counsel was compelled to object and the trial court had to admonish the spectators. Although the record reflects that defense counsel objected to the reactions of one of the spectators, it does not support his claim that that spectator was a member of the family of one of the victims. (R. 1578.)